**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL VAN DORP, Individually and on behalf of all others similarly situated, | Case No: 2:19-CV-10792-ES-MAH |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| INDIVIOR PLC, SHAUN THAXTER, MARK CROSSLEY, and CARY J. CLAIBORNE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Michael Van Dorp ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by

and through his attorneys, which included, among other things, a review of the
Defendants' public documents, conference calls and announcements made by
Defendants, United States Securities and Exchange Commission ("SEC") filings,
wire and press releases published by and regarding Indivior PLC ("Indivior" or the
"Company"), analysts' reports and advisories about the Company, interviews with
witnesses, and information readily obtainable on the Internet. Plaintiff believes that
substantial evidentiary support will exist for the allegations set forth herein after a
reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities, other than
Defendants and their affiliates, who purchased or otherwise acquired Indivior
American Depositary Shares ("ADSs") between March 10, 2015 and April 9, 2019,
inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages
caused by Defendants' violations of the federal securities laws under the Securities
Exchange Act of 1934 (the "Exchange Act").

2.      Indivior is a pharmaceutical company that specializes in the treatment
of opioid dependence. Indivior operated as a wholly owned subsidiary of Reckitt
Benckiser Group PLC until being spun off into a separate company in 2014.

3.      In October 2002, the FDA approved Reckitt's application for the first
buprenorphine-containing drugs for the treatment of opioid dependence: Suboxone

Tablets and Subutex Tablets. Indivior had the exclusive right to market and distribute these drugs in the United States for seven years before any competitors would be allowed on the market.

4.      By 2007, Indivior was generating over $260 million per year in revenue from Suboxone Tablets. Fearing that it would lose most of this revenue once competitors were allowed on the market, Defendants hatched a scheme to switch patients to a new film version of Suboxone that would enjoy a new exclusivity period free from competition.

5.      First, even before the FDA approved Suboxone Film in August 2010, Defendants repeatedly told health care providers and health care benefit program— in direct presentations and marketing materials—that Suboxone Film was safer for children, less divertible, and less abusable than other opioid-addiction treatment drugs.

6.      Second, Indivior sought to boost profits even further by using its "Here to Help" program to connect opioid-addicted patients to doctors who were willing to prescribe Suboxone Film. The Company also revamped its incentive system for its salespeople to reward film sales instead of tablet sales.

7.      Third, Indivior withdrew Suboxone Tablets from the market due to "increasing concerns regarding pediatric exposure." This discontinuance forced the FDA to delay approval of generic tablets while safety tests were conducted.

8.    Indivior's efforts were incredibly successful. Suboxone Film dominated the opioid dependence treatment market and led to billions of dollars in revenues for Indivior.

9.    But, as detailed in an April 9, 2019, criminal indictment of Indivior, this entire scheme was a massive criminal fraud that endangered patients, deceived health care providers, drained funds from Medicare and Medicaid, and harmed investors.

10.   Internal Indivior documents collected by investigators exposed that Defendants knew that there was no scientific basis for its claims that Suboxone Film was safer for children, less divertible, and less abusable than other opioid-addiction treatment drugs. Indeed, Defendants knew that Suboxone Film was—in many ways—*more* dangerous for children and *more* susceptible to diversion. Despite internal acknowledgement of these falsehoods within the Company, corrections were never issued to patients, providers, or investors.

11.   Further, the Company's Here to Help program was sending opioid-addicted patients to doctors it knew were prescribing Suboxone and other opioids to more patients than allowed by federal law, at high doses, and in a careless and clinically unwarranted manner. Indivior continued referring patients to physicians it knew were illegally prescribing Suboxone Film until at least December 2016.

12.   Finally, Defendants' discontinuance of Suboxone Tablets—announced in 2012 and completed in 2013—was not based on any real concern for child

exposure. Rather, the Company used the discontinuance as a way to delay generic versions of the tablets from entering the market.

13.     The opioid epidemic has killed tens of thousands of Americans per year and torn apart countless families. As those struggling with addiction and dependence sought treatment, Indivior funneled them to crooked doctors and fed them misinformation meant to line Defendants' pockets. The Company never corrected its materially false statements about Suboxone Film. The Company never disclosed to investors that its Suboxone Film revenues were the product of a massive criminal fraud. Nor did the Company disclose the extent of its liability stemming from the governmental investigations investigation into Indivior—including the Department of Justice investigation that began in December 2013. Instead, throughout the Class Period, the Company repeatedly touted its compliance with the Company's Code of Business Conduct, touted its compliance with applicable laws, and continued to mislead investors about the pediatric safety of Suboxone Film relative to Suboxone Tablets.

14.     Defendants revealed a small portion of the truth on February 15, 2018, when the Company announced that it had increased its provision for investigative and antitrust litigation matters by $185 million to $438 million, causing the price of Indivior's ADRs to decline by 5.8% from $28.14 to $26.51. Unbeknownst to investors, the $438 million charge paled in comparison to Indivior's liability for its

billions of dollars of illicit Suboxone revenue. Further, the Company still failed to disclose that it faced exclusion from Medicare and Medicaid programs as a result of its criminal conduct—a consequence that would be fatal to its business.

15.     The full truth was finally revealed on April 9, 2019, when the Department of Justice filed a federal grand jury indictment charging Indivior with conspiracy to commit wire fraud, mail fraud, and health care fraud; one count of health care fraud; four counts of mail fraud; and twenty-two counts of wire fraud. The indictment stated that Indivior would be required to forfeit at least $3 billion, several business units, and several patents upon conviction. The indictment extensively details the multiyear nationwide fraud by citing and quoting internal Company communications and communications with regulators, health care providers, and third party contractors. The indictment not only conclusively outlines the Company's fraud, it also explicitly shows that Thaxter was intimately involved in every step of the fraudulent scheme—including its planning, execution, and coverup.

16.     On this news, Indivior ADRs plummeted $4.48 or more than 66% to close at $2.30 per ADR on April 10, 2019, damaging investors.

17.     On July 11, 2019, the Department of Justice announced that it had reached a $1.4 billion resolution with Reckitt related its role in Indivior's misconduct prior to the 2014 demerger. The resolution included Reckitt's forfeiture

of proceeds totaling $647 million, civil settlements with the federal government and the states totaling $700 million, and an administrative resolution with the Federal Trade Commission for $50 million.

## JURISDICTION AND VENUE

18.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

20.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

21.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

22.     Plaintiff, as set forth in the previously filed certification incorporated by reference herein, purchased Indivior securities during the Class Period and was economically damaged thereby.

23.     Defendant Indivior, together with its subsidiaries, develops, manufactures, and sells buprenorphine-based prescription drugs for the treatment of opioid dependence. The Company's product pipeline focuses on treating opioid use disorder, alcohol use disorder, opiate overdose, and schizophrenia. Indivior is incorporated in and has its principal executive offices in the United Kingdom. Indivior's sponsored ADRs trade on the OTC under the ticker symbol "INVVY".

24.     Defendant Shaun Thaxter ("Thaxter") has served as the Company's Chief Executive Officer ("CEO") and a director, and thus a member of the Board of Directors (the "Board") since November 4, 2014. Thaxter led the pharmaceutical division at Reckitt from 2003 until the 2014 demerger.

25.     Defendant Mark Crossley ("Crossley") has served as the Company's Chief Financial Officer ("CFO") and a director, and thus a Board member, since February 2017. Crossley previously served as the Company's Global Finance Director from 2012-2014 and its Chief Strategy Officer from 2014 to 2017.

26.     Defendant Cary J. Claiborne ("Claiborne") served as the Company's CFO and a director, and thus a Board member, from November 10, 2014 until February 2017.

27.     Defendants Thaxter, Crossley, and Claiborne are collectively referred to herein as the "Individual Defendants."

28.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

> (g)     approved or ratified these statements in violation of the federal
>
> securities laws.

29.    Indivior is liable for the acts of the Individual Defendants and its
employees under the doctrine of *respondeat superior* and common law principles
of agency because all of the wrongful acts complained of herein were carried out
within the scope of their employment.

30.    The scienter of the Individual Defendants and other employees and
agents of the Company is similarly imputed to Indivior under *respondeat superior*
and agency principles.

31.    Defendants Indivior and the Individual Defendants are collectively
referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

32.    Indivior was a wholly owned subsidiary of Reckitt Benckiser
("Reckitt"), a British consumer goods company, until demerging into a separate
company in December 2014. Prior to the demerger, Indivior was known as Reckitt
Benckiser Pharmaceuticals Inc.

33.    Indivior sponsors a Level I ADR program in the United States. Indivior
filed a Form F-6 registration statement with the SEC registering its ADRs on
December 2, 2014. The registration of Indivior's ADRs became effective on

December 23, 2014. The ADRs are publicly traded in the US on the OTC Market, under symbol INVVY. The value of one Indivior ADR corresponds to the value of five Indivior shares.  ADRs are Dollar-denominated securities which represent ownership of equity in non-US companies. ADRs trade, clear and settle like any US shares and are held in US custody.

34.     In October 2002, the US Food and Drug Administration (the "FDA") approved Suboxone Tablets for the treatment of opioid addiction, granting Reckitt seven years of exclusivity before generic competitors could enter the market. Indivior marketed and distributed Suboxone Tablets in the United States.

35.     By 2007, Reckitt and Indivior's annual revenue from Suboxone Tablet sales had exceeded $260 million, but the Company forecasted that most of this revenue would disappear when generic versions of Suboxone were allowed on the market in October 2009.

36.     Indivior hatched a two-pronged strategy to delay and mitigate this impending financial loss. First, the Company began developing a new film version of Suboxone Tablets ("Suboxone Film") that it believed would be protected by patents. Indivior planned to market Suboxone Film as a safer alternative to Suboxone Tablets. Second, the Company planned to withdraw Suboxone Tablets from the market using safety concerns as a pretext, triggering an FDA safety review that could delay generic versions of Suboxone Tablets from hitting the market for

as long as a year. Thaxter told Reckitt executives in January 2010 that "[o]ur immediate focus is to get the FDA approval for [Suboxone Film] asap to switch the business ahead of the generic."

37.     Indivior submitted Suboxone Film for FDA approval in October 2008. In August 2009, the FDA declined to approve Indivior's application for Suboxone Film because of its inadequate risk evaluation and mitigation strategy ("REMS") for misuse, abuse, and accidental overdose. Indivior resubmitted its application for Suboxone Film to the FDA in November 2009, this time including a REMS.

38.     On March 29, 2010, the FDA wrote a letter to Indivior disputing the Company's claim that Suboxone Film's packaging protected against accidental child exposure. Further, the FDA explained that Suboxone Film was even more dangerous to children than Suboxone Tablets because the film cannot be spit out:

> No, we do not agree that the packaging for [Suboxone Film] provides meaningful incremental protection against pediatric exposure. Although the foil pouches fulfill the child resistant effectiveness standards and the foil pouch bears warning statements alerting patients to keep out of reach of children, no data were provided to support that these measures will encourage patients to store [Suboxone Film] in a manner which prevents accidental pediatric ingestion . Because patients are known to divide tablets, it m ay be expected that patients will remove film from the package and have partial doses that are neither in the child-resistant pouch nor in a child-resistant  medication bottle. Furthermore, because the film cannot be spit out (unlike a tablet) it is possible that a child who obtains access to even one dose might be more adversely affected than a child who obtains access to a single tablet.

39.    At this point, the Company fully understood that Suboxone Film had attributes that potentially could make it more dangerous to children, including that it could not easily be spit out if accidentally taken by a child; dissolved more rapidly, leaving less time to remove it from a child's mouth before absorption; had potentially a higher bioavailability at certain doses, potentially increasing the severity of an incident; was formulated to taste better, potentially reducing the likelihood that a child would seek to remove it; and could not easily be re-secured in its original packaging, which, unlike a bottle with a child-resistant cap, was not designed to be re-closed.

40.    The FDA approved Suboxone Film on August 30, 2010.

**<u>Defendants' Criminal Scheme to Increase Suboxone Film Revenues</u>**

41.    Immediately following the FDA's approval of Suboxone Film, Thaxter assured Reckitt's CEO and CFO that "[w]e will be making the most of every minute between now and generic approval to convert our tablet business to film," including a "Full Blitz campaign for salesforce through Thanksgiving." The "Full Blitz" campaign consisted of Indivior salespeople making sales presentations to physicians touting the "diversion and misuse and pediatric safety" of Suboxone Film relative to tablets, despite knowing that these claims were not supported by scientific studies.

42.    On September 3, 2010, Reckitt's CEO emailed Thaxter and other Indivior executives stating that Suboxone Film was "safer" than tablets and encouraging Indivior to convert patients from tablets to film to "protect[] our Net Revenues in the USA."

43.     On October 17, 2010, Thaxter told Indivior personnel that performance reviews and incentive programs for salespeople would be revised to reward "film sales only," and that those without adequate film sales might be fired.

44.     On October 25, 2010, an Indivior sales supervisor emailed Thaxter a set of talking points that Indivior's salespeople were using to convince physicians and pharmacists that Suboxone Film had "[r]educed misuse/diversion" and "reduced pediatric exposure" compared to tablets.

45.     In August 2011, for example, Indivior's Treatment Advocate Resource Kit stated that "SUBOXONE Film addresses important public health concerns of unintentional multidose exposure because it: Provides a child-resistant, unit-dose packaging to help mitigate unintentional pediatric exposure." This statement was in direct contradiction to the FDA's March 2010 rejection of Indivior's claim that packaging for Suboxone Film provides meaningful incremental protection against pediatric exposure

46.     The Indictment details 30 illustrative examples between September 2010 and December 2011 of Indivior sales representatives making false statements to health care providers about the safety and diversion advantages of Suboxone Film to induce them to prescribe, dispense, and/or recommend Suboxone Film. These false statements were provided by sales representatives to their supervisors to be used as models for other sales representatives.

14

47.    Beginning in December 2011, these written reports detailing sales representatives' false statements to health care providers were discontinued because Indivior's compliance committee determined they were "compliance risks."

### Defendants' Make Materially False Statements to the FDA to Delay Generic Competition

48.    Indivior announced in September 2012 that it would discontinue Suboxone Tablets in early 2013 due to its purported safety concerns. The Company sent letters to healthcare professionals informing them of this decision and advising them to switch patients to the film. On March 18, 2013, Indivior discontinued its Suboxone Tablet product.

49.    In September 2012, Indivior submitted a citizen petition requesting that the FDA reject any generic Suboxone Tablet applications or subject them to additional requirements because it knew doing so could delay approval of generics while the FDA reviewed it. The petition misrepresented a study that Indivior had commissioned and falsely claimed that there was evidence that the packaging of Suboxone Film reduced the risk of pediatric exposures. On February 22, 2013, the FDA denied the citizen petition because the data did not support Indivior's claims.

50.    On September 25, 2012, Thaxter approved a press release posted to Reckitt's website stating that Suboxone Tablet was discontinued "due to increasing concerns with pediatric exposure."

**Defendants Increase Profits By Illegally Incentivizing Health Care Providers
to
Prescribe and Dispense Suboxone Film In Unsafe and Clinically
Unwarranted Manner**

51.     Under Thaxter's direction, Indivior used a variety of methods to
incentivize health care providers to prescribe and dispense Suboxone Film despite
knowing that many of these providers were prescribing opioid addiction treatments
to more patients at a time than allowed by federal law, in daily doses in excess of
any clinical indication, and in other careless manners.

52.     Indivior promoted its "Here to Help" program as a way for patients and
potential patients to find and connect with health care providers who prescribe
Suboxone.

53.     By July 2010, Defendants were aware that the 564 highest-prescribing
physicians in the United States—who prescribed buprenorphine-containing drugs
to an average of more than 200 patients at a time, well in excess of the 24 allowed
under federal law—accounted for one third of Indivior's business. Indivior also
received numerous firsthand reports that physicians participating in the Here to Help
program were prescribing Suboxone to known drug traffickers, trafficking
Suboxone in the parking lots of their offices, and otherwise carelessly prescribing
Suboxone.

54.     Despite this knowledge, the Company continued using its Here to Help
program to funnel patients to these problematic physicians. Further, the Company

allowed many of these problematic physicians to participate in Indivior's "Treatment Advocate" speaker program series, which provided physicians with marketing materials and access to lunch and dinner events.

55.     In one particularly glaring example, Indivior repeatedly funneled patients to a Kentucky doctor who prescribed dosages of Suboxone exceeding the maximum clinical indication to far more patients at a time than allowed by federal law. Indivior knew about the doctor's problematic prescribing in 2008, yet the Company continued funneling patients to him as late as December 2016. In 2011, Indivior granted its sales representative of the year award to the sales representative responsible for marketing Suboxone Film to this doctor. In 2012, Indivior sponsored the doctor's clinic's annual meeting. On June 4, 2012, the Kentucky Board of Medical Licensure indefinitely restricted this doctor's authorization to prescribe Suboxone for opioid dependence. Undeterred, Indivior referred an additional 140 patients to the doctor between June 25, 2012 and December 2, 2016.

56.     Defendants never disclosed these illicit referrals to problematic physicians to patients, health care providers, or investors.

**Indivior's Fraudulent Scheme to Promote**
**Suboxone Film Violated Its Code of Conduct**

57.     The Company's Code of Conduct, effective December 2014, states, in pertinent part, the following regarding the Company's policies with respect to compliance with laws, regulations, company policies, and interactions with healthcare professions:

**4. ETHICAL BUSINESS CONDUCT AND FAIR DEALING**

All employees and contractors must accept responsibility for maintaining and enhancing the Company's reputation for integrity and fairness in its business dealings. In its everyday business transactions, the Company must be seen to be dealing even-handedly and honestly with all its consumers, customers, suppliers, employees, contractors, governments and regulators and others with whom the Company has a relationship.

**5.   COMPLIANCE   WITH   LAWS,   REGULATIONS   AND COMPANY POLICIES**

General Principles

5.1 There are many laws and regulations applicable to the Company's business. ***All employees and contractors must be aware of and observe all laws and regulations governing their activities***. Some specific areas of legal and regulatory attention include: health and safety; anti-bribery laws, employment and work place practices; protection of the environment; competition; intellectual property; and the payment of taxes and social security. ***Compliance with the Company's internal operating policies and procedures is of equal importance***.

Regulatory Compliance

 5.2 The Company's global operations include products that are highly regulated by local laws, regulations, and government agencies. Failure to comply with local registration, manufacturing, sales, and reporting obligations can expose the Company, individual employees, contracting firms and individual contractors to significant penalties, including personal fines and imprisonment. All employees and

18

contractors are required to support the Company's regulatory compliance obligations, which include the appropriate reporting of adverse events.

\*       \*       \*

## 6. INTERACTIONS WITH HEALTHCARE PROFESSIONALS

6.1 The Company adheres to its Governing Principles when interacting with healthcare professionals ("HCPs"), *committing to the highest ethical standards and legal requirements. We act responsibly and with integrity and interact with HCPs in accordance with applicable laws when providing information about our products, which are at all times intended to provide up‑to‑date data regarding the use of our products and associated benefits to consumers and to the larger public*.

6.2 *We promote dissemination of information based on empirical results and do not allow business pressures to influence our interactions with HCPs. Our goal is to ensure that HCPs are provided with all data and information relating to our products that helps to improve end‑user treatment and care.*

6.3 All representatives of the Company must adhere strictly to our Anti-Bribery policy when interacting with HCPs. In particular, employees and contractors must not offer anything to HCPs that could be considered or construed as a bribe or an attempt to solicit favourable treatment

\*       \*       \*

## 7. PRODUCT PROMOTION

7.1 The U.S., European and wider global pharmaceutical industry is highly regulated because our products directly impact on consumer health. *We comply with the wide array of applicable laws and regulations concerning promotion of our products.*

\*       \*       \*

**18. COMPLIANCE WITH THIS CODE**

18.1 ***All employees and contractors are required to comply with this Code and are personally responsible for doing so***. It is the responsibility of the Board to ensure, so far as is reasonably practicable, that the principles and ethical values embodied in this Code are communicated to all colleagues of the Company.

\*     \*     \*

18.4 The Board will not criticise management for any loss of business resulting from adherence to this Code. ***The Company undertakes that no employee or contractor will suffer as a consequence of bringing to the attention of the Board or senior management a known or suspected breach of this Code nor will any employee or contractors suffer any adverse employment or contract decision for abiding by this Code.***

(Emphasis added.)

58.     Additionally, the Terms of Reference of the Company's Nomination & Governance Committee states in relevant part that "[t]he Committee shall receive regular reports at least quarterly on corporate compliance matters, which may include . . . a report on the status of the Company's Corporate Compliance Program, including policy updates, training and monitoring activities to ensure adherence to applicable legal and regulatory standards and to the Code of Business Conduct where there may be a material impact on the Company."

**Materially False and Misleading**
**Statements Issued During the Class Period**

59.     On March 10, 2015, the Company issued a press release containing a web link to its financial results for the fiscal year ended December 31, 2014 (the

20

"2014 Annual Report"). The 2014 Annual Report contained a confirmation by the Board, which included Defendants Thaxter and Crossley, attesting to the accuracy of financial reporting and a fair review of the development and performance of the business, as well as the attendant opportunities and risks.

60.     The Company's 2014 Annual Report stated the following regarding compliance with the Code of Business Conduct:

> Indivior's control environment is supported by a Code of Business Conduct, upon which employees receive training annually, and a range of policies on corporate responsibility including a set of Guiding Principles. Other key elements within the internal control structure include: the Board and executive management; organizational structure; budgets and financial plans; management reporting; risk management; Operating Unit controls; compliance controls and monitoring.

> The Board confirms that reviews of the appropriateness and effectiveness of the system of internal control and risk management throughout the period from demerger and up to the date of approval of the Annual Report have been satisfactorily completed in compliance with provision C.2.1 of the Code

61.     The Company's 2014 Annual Report stated the following regarding compliance with law and ethical behavior:

> Business practices in the pharmaceutical industry are subject to increasing scrutiny by government authorities. Failure to comply with applicable laws and rules and regulations in any jurisdiction may result in fines, civil and/or criminal legal proceedings.

62.     The Company's 2014 Annual Report stated the following with respect to the investigation by the U.S. Department of Justice ("DOJ"):

In December 2013, the USAO-VAW executed a search warrant on
RBP's headquarters in Richmond and conducted searches of the homes
of four field-based employees. The USAO-VAW has since served
a number of subpoenas relating to Suboxone® Film, Subutex® Tablet,
buprenorphine and any real or potential competitor, among other issues.
The investigation is ongoing and RBP is in the process of responding
to the USAO-VAW by producing documents and other information.
Given the limited information available to the Group regarding the
foregoing civil and criminal investigations, it is not possible at this time
to predict with any certainty if there will be a liability associated with
these investigations nor, if one were to occur, is there an ability to
quantify the potential impact on the Financial Statements of the Group.

63.    On May 5, 2015, the Company issued its 1st Quarter Results for 2015,

which stated the following about the DOJ investigation:

In December 2013, the USAO-VAW executed a search warrant on
RBP's headquarters in Richmond and conducted searches of the homes
of four field-based employees. The USAO-VAW has since served a
number of subpoenas relating to Suboxone Film, Suboxone Tablet,
Subutex Tablet, buprenorphine and any real or potential competitor,
among other issues. The investigation is ongoing and RBP is in the
process of responding to the USAO-VAW by producing documents and
other information.

Given the limited information available to the Indivior Group regarding
the foregoing civil and criminal investigations, it is not possible at this
time to predict with any certainty if there will be a liability associated
with these investigations nor, if one were to occur, is there an ability to
quantify the potential impact on the financial statements of the Indivior
Group.

64.    On April 8, 2016, the Company issued a press release containing a web

link to its financial results for the fiscal year ended December 31, 2015 (the "2015

Annual Report"). The 2015 Annual Report contained a confirmation by the Board,

which included Defendants Thaxter and Crossley, attesting to the accuracy of

financial reporting and a fair review of the development and performance of the
business, as well as the attendant opportunities and risks.

65.    The Company's 2015 Annual Report stated the following regarding
compliance with law and ethical behavior:

> Business practices in the pharmaceutical industry are subject to
> increasing scrutiny by government authorities. Failure to comply with
> applicable laws and rules and regulations in any jurisdiction may result
> in fines, civil and/or criminal legal proceedings.

66.    The Company's 2015 Annual Report stated the following with respect
to the investigation by the DOJ:

> A federal investigation of Indivior's marketing and promotion practices
> initiated in December 2013 is continuing. The United States Attorney
> for the Western District of Virginia has served a number of subpoenas
> relating to Suboxone® Film, Suboxone® Tablet, Subutex® Tablet,
> buprenorphine and the Group's competitors, among other issues.
> Indivior is in the process of responding by producing documents and
> other information in connection with this ongoing investigation. It is
> not possible at this time to predict with any certainty or to quantify the
> potential impact of this investigation on the Company. Indivior is
> cooperating fully with the relevant agencies and prosecutors and will
> continue to do so.

67.    On August 24, 2016, the Company filed its amended Form 20-F/A,
which included a certification from Thaxter in his role as CEO. In its Form 20-F/A,
the Company stated, in relevant part, that the Company was committed to the Code
of Business Conduct adopted by the Board:

> Our Board has adopted a Code of Business Conduct that describes our commitment to, and requirements in connection with, ethical issues relevant to business practices and conduct.

68.    The Company's Form 20-F/A also made false and misleading claims about the safety of Suboxone Film relative to Suboxone Tablets:

> We announced that we were discontinuing distribution of SUBOXONE® Tablet in the U.S. market in September 2012 owing to pediatric safety concerns. . . . SUBOXONE® Film was developed as an alternative to the sublingual tablet with the intention of producing similar safety and efficacy to SUBOXONE® Tablet, but with additional safety and compliance features.

69.    On November 2, 2016, the Company issued its 3rd Quarter Results for 2016. Among other things, the 2016 3rd Quarter Results disclosed that the Company had recorded a $220 million charge for the antitrust litigation and various government investigations the Company faced:

> The Company has recorded a charge of $220m in the third quarter of 2016 for the investigative and antitrust litigation matters noted below. Because these matters are in various stages, the Company cannot predict with any certainty the ultimate resolution or cost of all of the matters. The final amount might be materially different from this reserve.

70.    On November 2, 2016, the Company held a conference call with analysts to discuss its 2016 3rd Quarter Results. In response to a request from an analyst for "some color on how you came to the $220 million provision for the litigation," Thaxter stated in relevant part:

> With respect to the $220 million, I think we've made it very clear in the statement that this is a provision that's being made for all of the investigation matters that are going on at the moment. We've said for very long time that we're cooperating with the government, we're answering their questions and this is just where we are at the moment. So, I'm not able to offer you any more color behind the $220 million.

71.     On March 23, 2017, the Company issued a press release containing a web link to its financial results for the fiscal year ended December 31, 2016 (the "2016 Annual Report"). The 2016 Annual Report contained a confirmation by the Board, which included Defendants Thaxter and Claiborne, attesting to the accuracy of financial reporting and a fair review of the development and performance of the business, as well as the attendant opportunities and risks.

72.     The Company's 2016 Annual Report stated the following with respect to corporate behavior:

> Indivior is committed to responsible corporate behavior; this includes high standards of business conduct in our relationships with employees, contractors, customers, consumers, shareholders, suppliers, governments, competitors and the local communities in which we operate.
>
> Indivior's approach to business conduct and stakeholder communications is shaped by the Company's overall aims and objectives, its responsibilities arising from its status as a premium listed company on the London Stock Exchange, and its obligations under the regulations and laws that apply to its business activities.

73.     The Company's 2016 Annual Report stated the following regarding compliance with law and ethical behavior:

Business practices in the pharmaceutical industry are subject to increasing scrutiny by government authorities. Failure to comply with applicable laws and rules and regulations in any jurisdiction may result in fines, civil and/or criminal legal proceedings, each of which could have a material adverse impact on the business, prospects, results of operations and financial condition. Specifically see disclosure on page 44 referring to the current status of the DOJ investigation and other investigative and antitrust litigation matters, and the contingent liabilities disclosures in Note 20 of the financial statements on page 125.

74.     The Company's 2016 Annual Report stated the following with respect to the investigation by the DOJ:

A federal criminal grand jury investigation of Indivior, initiated in December 2013, is continuing, and includes marketing and promotion practices, pediatric safety claims, and overprescribing of medication by certain physicians. The US Attorney's Office for the Western District of Virginia has served a number of subpoenas relating to Suboxone® Film, Suboxone® Tablet, Subutex® Tablet, buprenorphine and our competitors, among other issues. We are in discussions with the Department of Justice about a possible resolution of the investigation. It is not possible at this time to predict with any certainty the potential impact of this investigation on us, or to quantify the ultimate cost of a resolution. We are cooperating fully with the relevant agencies and prosecutors and will continue to do so.

(a)     On February 15, 2018, the Company issued its Final Results for 2017.

Among other things, the 2016 3rd Quarter Results disclosed that the Company had increased its provision for investigative and antitrust litigation matters by $185 million to $438 million:

The Group increased its provision for investigative and antitrust litigation matters to $438m. Because these matters are in various stages, Indivior cannot predict with any certainty the ultimate resolutions, costs or timing of the resolutions of any of the matters. The final aggregate

settlement amount may be materially different from this provision. The Group continues in discussions with the Department of Justice about a possible resolution to its investigation. The Group cannot predict with any certainty whether it will reach an ultimate resolution with the Department of Justice or any or all of the parties to the other matters noted below under State Subpoenas and FTC Investigation and Antitrust Litigation.

75.     On February 15, 2018, the Company held a conference call with analysts to discuss its 2017 Final Results. In his opening remarks, Thaxter attempted to minimize the significance of the Company's $438 million charge:

> I do, in the interest of transparency, want to make sure that you're aware of the adjustment that we made to our legal provision. I'm not going to go into this in detail, everything that we're able to say has been released within our press release, so I'd refer you to that. And the key change is that we have increased our provision to $438 million. But the real news, the exciting news for the future of our company, of course, is the approval of SUBLOCADE.

76.     The market reacted swiftly to this news, as the price of Indivior's ADRs declined by 5.8% from $28.14 to $26.51.

77.     On March 22, 2018, the Company issued a press release containing a web link to its financial results for the fiscal year ended December 31, 2017 (the "2017 Annual Report"). The 2017 Annual Report contained a confirmation by the Board, which included Defendants Thaxter and Claiborne, attesting to the accuracy of financial reporting and a fair review of the development and performance of the business, as well as the attendant opportunities and risks.

78.     The Company's 2017 Annual Report stated that it had controls in place

in place to prevent violations of law:

> The Group requires compliance with laws, regulations and industry practice at all times. Its comprehensive compliance programs include a focused compliance staff and policies across the full panoply of operations . . .

> \* \* \*

> Regulatory and legal compliance is a key aspect of the Group's patient focused business model. The Group maintains a Corporate Compliance Department to guide compliance efforts through policies, training education and monitoring. ***These steps ensure adherence to industry codes, laws and regulations in all the countries in which the Group operates. The department also works to ensure that all of the Group's operations are conducted in line with all regulatory requirements and industry codes of ethics***, including those published by US PhRMA; Association of the British Pharmaceutical Industry (ABPI); and by Medicines Australia, along with the Pharmaceutical Manufacturer's Compliance Program Guide published by the Office of Inspector General of the US Department of Health and Human Services.

> \* \* \*

> Indivior significantly expanded its compliance and related monitoring activities in 2017. These procedures did not discover any material instances of non-compliance with the Group's business conduct policies and procedures during the year.

> (Emphasis added.)

79.    The Company's 2017 Annual Report stated the following regarding compliance with law and ethical behavior:

> Business practices in the pharmaceutical industry are subject to increasing scrutiny by government authorities. Failure to comply with applicable laws and rules and regulations in any jurisdiction may result in fines, civil and/or criminal legal proceedings, each of which could have a material adverse impact on the business, prospects, results of

operations and financial condition. Specifically see disclosure on page 46 referring to the current status of the DOJ investigation and other investigative and antitrust litigation matters, and the contingent liabilities disclosures in Note 20 of the financial statements on page 141.

80.     The Company's 2017 Annual Report stated the following with respect to the investigation by the DOJ:

> A U.S. federal criminal grand jury investigation of Indivior initiated in December 2013 is continuing, and includes marketing and promotion practices, pediatric safety claims, and overprescribing of medication by certain physicians. The U.S. Attorney's Office for the Western District of Virginia has served a number of subpoenas relating to SUBOXONE® Film, SUBOXONE® Tablet, SUBUTEX® Tablet, buprenorphine and our competitors, among other issues. The Group continues in discussions with the Department of Justice about a possible resolution to its investigation. It is not possible at this time to predict with any certainty the potential impact of this investigation on us or to quantify the ultimate cost of a resolution. We are cooperating fully with the relevant agencies and prosecutors and will continue to do so.

81.     On March 22, 2018, the Company issued a press release containing a web link to its financial results for the fiscal year ended December 31, 2017 (the "2017 Annual Report"). The 2017 Annual Report contained a confirmation by the Board, which included Defendants Thaxter and Claiborne, attesting to the accuracy of financial reporting and a fair review of the development and performance of the business, as well as the attendant opportunities and risks.

82.     The Company's 2017 Annual Report stated the following with respect to the investigation by the DOJ:

A U.S. federal criminal grand jury investigation of Indivior initiated in December 2013 is continuing, and includes marketing and promotion practices, pediatric safety claims, and overprescribing of medication by certain physicians. The U.S. Attorney's Office for the Western District of Virginia has served a number of subpoenas relating to SUBOXONE® Film, SUBOXONE® Tablet, SUBUTEX® Tablet, buprenorphine and our competitors, among other issues. The Group continues in discussions with the Department of Justice about a possible resolution to its investigation. It is not possible at this time to predict with any certainty the potential impact of this investigation on us or to quantify the ultimate cost of a resolution. We are cooperating fully with the relevant agencies and prosecutors and will continue to do so.

83.    On March 14, 2019, the Company issued a press release containing a web link to its financial results for the fiscal year ended December 31, 2018 (the "2018 Annual Report"). The 2018 Annual Report contained a confirmation by the Board, which included Defendants Thaxter and Claiborne, attesting to the accuracy of financial reporting and a fair review of the development and performance of the business, as well as the attendant opportunities and risks.

84.    The Company's 2018 Annual Report stated the following regarding compliance with applicable laws:

Our Group operates on a global basis and the pharmaceutical industry is both highly competitive and regulated. ***Complying with all applicable laws and regulations, including engaging in commercial activities that are consistent with legal and industry standards, and our Group's Code of Conduct are core to the Group's mission, culture and practices***. Failure to comply with applicable laws and regulations may subject the Group to civil, criminal and administrative liability, including the imposition of substantial monetary penalties, fines, damages and restructuring the Group's operations through the imposition of compliance or integrity obligations, and have a potential

adverse impact on the Group's prospects, reputation, results of operations and financial condition.

(Emphasis added.)

85.    The Company's 2018 Annual Report stated the following with respect to the investigation by the DOJ:

> A U.S. federal criminal grand jury investigation of Indivior initiated in December 2013 is continuing, and includes marketing and promotion practices, pediatric safety claims, and overprescribing of medication by certain physicians. The U.S. Attorney's Office for the Western District of Virginia has served a number of subpoenas relating to SUBOXONE® Film, SUBOXONE® Tablet, SUBUTEX® Tablet, buprenorphine and our competitors, among other issues. The Group has responded to the subpoenas and has otherwise cooperated fully with the Department and prosecutors and will continue to do so. The Group is in advanced discussions with the Department of Justice about a possible resolution to its investigation. However, it is not possible to predict with any certainty the potential impact of this investigation on the Group or to quantify the ultimate cost of a resolution.

86.    The statements contained in ¶¶59-85 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Indivior and its executives engaged in an illicit nationwide scheme to increase prescriptions of Suboxone Film, before and during the Class Period, in contradiction to its purported Code of Business Conduct; (2) Indivior incentivized its sales representatives to provide misleading information to patients and health cate

providers in direct contradiction to its purported Code of Business Conduct; (4) Indivior illegally obtained billions of dollars in revenue from Suboxone Film prescriptions by deceiving health care providers and health care benefit programs; (5) as a result of the aforementioned misconduct, Indivior would face felony charges that would result in a $3 billion forfeiture upon conviction; (6) Indivior's serious misconduct meant that it faced exclusion from United States health care programs such as Medicare and Medicaid, even if Indivior was never convicted; (7) Indivior's provision of funds to resolve governmental investigations and litigation represented a small fraction of the funds required for a settlement; and (8) due to the foregoing, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

87.     On April 9, 2019, the DOJ filed an indictment asserting criminal charges against Indivior in connection with the Company's conduct in marketing Suboxone Film (the "Indictment").[1] The charges included one count of conspiracy to commit mail, wire, and health care fraud, one count of health care fraud, four

---

[1] The Indictment is attached as Exhibit 1 hereto. The DOJ filed a superseding indictment of Indivior on August 14, 2019, asserting virtually identical factual allegations and criminal counts. The superseding indictment is attached as Exhibit 2 hereto.

counts of mail fraud, and twenty-two counts of wire fraud. The Indictment described the fraudulent marketing scheme in extensive detail, providing numerous examples of misconduct, including:

> Beginning in or about 2010, Indivior executed an illicit nationwide scheme to increase prescriptions of Suboxone Film. In particular, Indivior illegally obtained billions of dollars in revenue from Suboxone Film prescriptions by deceiving health care providers and health care benefit programs into believing that Suboxone Film is safer and less susceptible to diversion and abuse than other, similar drugs. Indivior further sought to boost its profits from Suboxone Film by establishing a telephone program for patients to call to be connected with a doctor for opioid addiction/dependence treatment, which Indivior used to connect patients to doctors Indivior knew were prescribing Suboxone and/or other opioids in a careless and clinically unwarranted manner. Indivior's fraudulent scheme lasted for years and hindered patients', health care providers', and health care benefit programs' accurate assessments regarding opioid-addiction treatment in order to increase the company's profits.

> *   *   *

> INDIVIOR PLC, INDIVIOR INC. (also known as Reckitt Benckiser Pharmaceuticals Inc.), and their executives, employees, and agents used the discontinuation of Suboxone Tablet to materially falsely and fraudulently market Suboxone Film. Between on or about September 18, 2012, and the date of this Indictment, they prepared and caused to be prepared, and shipped and caused to be shipped by mail and private or commercial interstate carrier to their executives and employees and others throughout the United States, letters signed by INDIVIOR's medical director and used to promote Suboxone Film that contained materially false and fraudulent statements and representations . . .

> *   *   *

> INDIVIOR PLC, INDIVIOR INC. (also known as Reckitt Benckiser Pharmaceuticals Inc.), and their executives, employees, and agents knew that messages like those described in paragraphs 33-72 of the

Introduction to this Indictment materially influenced health care providers to prescribe and dispense Suboxone Film, and recommend the prescribing and dispensing of Suboxone Film. In or about January 2011, an INDIVIOR contractor reported to INDIVIOR executives, managers, and personnel that in a survey of 245 physicians who had prescribed Suboxone Film, 68 physicians (approximately 28%) stated that they did so because it "[decreases misuse/abuse/diversion," and 26 physicians (approximately 11%) stated that they did so for "[s]afety re: inadvertent use by children." Additionally, the physicians rated "Ability to minimize unintentional pediatric exposure" and "Reduces the likelihood of misuse & diversion" as the second and third leading reasons to prefer Suboxone Film, respectively.3 More than 80% of the physicians, and 98% of the high-prescribing physicians, stated that they learned about Suboxone Film from INDIVIOR salespeople.

*   *   *

INDIVIOR PLC, INDIVIOR INC. (also known as Reckitt Benckiser Pharmaceuticals Inc,), and their executives, employees, and agents knew that the messages described in paragraphs 33-72 of the Introduction to this Indictment, and others like them, were false and fraudulent. In addition to the FDA's letter of March 29, 2010, informing INDIVIOR that it lacked substantiation to claim that Suboxone Film better protects against accidental child exposure (discussed above), on or about June 30, 2011, an INDIVIOR contractor reviewing information as part of the Suboxone Film REMS told INDIVIOR that Suboxone Film was more frequently abused parenterally *(e.g.,* by injection) and involved in more accidental child exposures per million doses than Suboxone Tablet. INDIVIOR did not alert patients, physicians, pharmacists, health care benefit programs, or others to these findings, which cast doubt on INDIVIOR's promotional messages about Suboxone Film. Subsequently, between in or about December 2011 and February 2012, INDIVIOR's compliance committee determined that INDIVIOR salespeople's written reports of their promotional statements to physicians and pharmacists (examples of which are set forth in paragraphs 43-72, above) posed "compliance risks," and discontinued the reports, without contacting patients, physicians, pharmacists, health care benefit programs, or others to correct or retract the promotional statements reflected in the reports. In or about November 2012, INDIVIOR's medical director, vice president

for clinical affairs, and others discussed attributes of Suboxone Film that potentially could make it more dangerous to children, such as-that, "With a tablet, they've got options. They can spit it out. They can swallow it. With the film, not necessarily. We know, it's stuck" in the child's mouth.

\*      \*      \*

In or about 2012-13, INDIVIOR managers discussed that, "Under no circumstances can we make the claim that Suboxone Film is safer or better at reducing pediatric exposures," and "Saying Suboxone Film is safer than any tablet on the market because Film has less ability to be snorted/injected [is an] unsubstantiated superiority claim," but did not contact patients, physicians, pharmacists, health care benefit programs, or others to correct or retract the promotional statements INDIVIOR salespeople had already made.

\*      \*      \*

INDIVIOR executives, employees, and personnel knew from statistical and firsthand reports that certain physicians had prescribed buprenorphine-containing drugs to substantially more patients at a time than allowed by the DATA, at daily doses higher than 24 mgs of buprenorphine, and in a careless and clinically unwarranted manner. No later than in or about April 2009, INDIVIOR managers began receiving statistical reports that identified physicians overprescribing buprenorphine-containing drugs. One manager emailed another, copying INDIVIOR's medical director, stating, "It takes only a short time perusing the [statistical reports] to realize that we have some serious breaches of [the DATA law's cap on the number of patients a physician may treat] along with very careless and clinically unwarranted prescribing behaviors, (% of patients above 24mg)," and certain physicians "need to be removed from the [buprenorphine] practice arena." INDIVIOR managers also received firsthand reports from INDIVIOR salespeople and medical advisors that particular physicians were engaged in "continuous prescribing to patients known to be trafficking in Suboxone/Subutex;" allowing "prescriptions [to be] given when provider not present in office;" "charging] 400 per month" for prescriptions; and suspected of allowing "overt trafficking in provider's parking lot."

\*      \*      \*

Between in or about 2006 and the date of this Indictment, INDIVIOR PLC, INDIVIOR INC.' (also known as Reckitt Benckiser Pharmaceuticals Inc,), and their executives, employees, and agents did devise and intend to devise a scheme and artifice to defraud and to obtain money and property from health care benefit programs by means of materially false and fraudulent pretenses, representations, and promises, by (A) making materially false and fraudulent statements and representations to health care providers to induce them to prescribe, dispense, and recommend Suboxone Film; (B) preparing and causing to be prepared, and shipping and causing to be shipped, materially false and fraudulent marketing materials promoting Suboxone Film; (C) making materially false and fraudulent statements and representations to and relating to state Medicaid administrators and others to promote Suboxone Film; and (D) marketing Suboxone Film to health care providers to be prescribed and dispensed in a careless and clinically unwarranted manner.

88.     According to the Indictment, Indivior executives were aware that

Suboxone Film was being carelessly overprescribed by several doctors but

Indivior continued to target those doctors in their tailored marketing:

INDIVIOR executives were aware of the careless, clinically unwarranted prescribing. On or about July 22, 2009, INDIVIOR's chief executive officer wrote to INDIVIOR's vice president for clinical affairs, "I think that the process for reporting rogue physicians is going to be very important." On or about July 14, 2010, INDIVIOR executives met and discussed data indicating that the 564 highest-prescribing physicians in the United States prescribed buprenoiphine-containing drugs to an average of more than 200 patients at a time, and the highest prescribers, which INDIVIOR called "Super P8s," accounted for 33% of INDIVIOR's business.

\*      \*      \*

INDIVIOR continued to include physicians it knew were issuing careless, clinically unwarranted opioid prescriptions in the Here to Help

and Treatment Advocate programs, and otherwise market Suboxone Film to them. On or about the stated dates, the identified INDIVIOR executives, employees, and agents communicated the information described below relating to aiding, abetting, counseling, commanding, inducing, and procuring Doctor A, located in or around Cedar Bluff, Galax, and Willis, Virginia, to switch prescriptions to Suboxone Film where Doctor A exceeded the maximum number of patients allowed at a time, where daily doses exceeded the maximum indicated for additional clinical advantage, and where prescriptions were issued in a careless and clinically unwarranted manner . . .

89.    The Indictment was rife with examples of misconduct by Indivior's top executives—including its Thaxter, who was Indivior's CEO at the time. Several examples of CEO misconduct include:

On or about January 22, 2010, INDIVIOR's chief executive officer told Company A executives, "Our immediate focus is to get the FDA approval for [Suboxone Film] asap to switch the business ahead of the generic."

*       *       *

On or about August 30, 2010, the FDA approved Suboxone Film, including the REMS and prescribing information for the drug. None of these materials stated that Suboxone Film was safer than alternative drugs such as tablets, or reduced the risk of misuse, abuse, diversion, or accidental child exposure. Nevertheless, INDIVIOR's chief executive officer told Company A executives including its chief executive officer and chief financial officer, "We will be making the most of every minute between now and generic approval to convert our tablet business to film," including a "Full Blitz campaign for salesforce through Thanksgiving." For the full blitz campaign, INDIVIOR salespeople planned to raise "diversion and misuse and pediatric safety" in sales presentations to physicians, even though there were no scientific studies to establish that Suboxone Film was safer with regard to diversion, misuse, or pediatric safety.

37

*     *     *

On or about October 17, 2010, INDIVIOR's chief executive officer told INDIVIOR personnel to revise the performance appraisals and incentive programs for salespeople to reward "film sales only." He stated that INDIVIOR's salespeople had "every possible resource to enable them to generate demand for a scheduled narcotic that is being given away for free to an addicted population," and those without "adequate film sales" may be fired. Thereafter, INDIVIOR revised the performance appraisals and incentive programs to be based primarily on the percentage of Suboxone Film compared to tablet sales in the salesperson's territory (sometimes called the "film market share" or "film share").

*     *     *

On or about April 13, 2011, INDIVIOR's chief executive officer materially falsely and fraudulently stated in a corporate newsletter that Suboxone Film "has the potential for greater child safety."

*     *     *

In or about July 2012, at a Company A investor presentation, in the presence of Company A's chief executive officer, INDIVIOR's chief executive officer materially falsely and fraudulently stated that Suboxone Film was "less divertable and abusable."

*     *     *

On or about September 18, 2012 (about four days later), INDIVIOR and Company A sent a "Notice of Discontinuance" of Suboxone Tablet to the FDA, stating that the reason for the discontinuance was "increasing concerns regarding pediatric exposure to" Suboxone Tablet. INDIVIOR's and Company A's respective chief executive officers approved the notice, even though they knew the primary reason for the discontinuance was to delay FDA approval of generic Suboxone.

On or about September 25, 2012, INDIVIOR and Company A submitted a petition to the FDA, signed by INDIVIOR's medical director, stating that INDrVIOR discontinued Suboxone Tablet "due to safety concerns" about tablets, and asking the FDA not to approve generic versions of Suboxone Tablet. INDIVIOR's and Company A's

respective chief executive officers approved the petition, even though they knew the primary reason for the discontinuance was to delay FDA approval of generic Suboxone.

\*     \*     \*

On or about September 25, 2012, Company A posted on its website a press release stating that Suboxone Tablet was discontinued "due to increasing concerns with pediatrie exposure." INDIVIOR's and Company A's respective chief executive officers approved the press release, even though they knew the primary reason for the discontinuance was to delay FDA approval of generic Suboxone.

\*     \*     \*

On or about November 17, 2013, INDIVIOR's chief executive officer stated to an INDIVIOR manager that in switching physicians, pharmacists, health care benefit programs, and others to Suboxone Film, INDIVIOR had achieved "the best format conversion ever in the history of the industry."

90.    The Indictment also provided a Notice of Forfeiture, stating that upon conviction of one or more of the felony counts in the indictment, property would be forfeited to the United States, including a monetary judgment of "not less than $3,000,000,000," seven business entities including all assets, inventory, and property related thereto, and several bank accounts, trademarks, and patents.

91.    On this news, Indivior ADRs plummeted $4.48, or more than 66%, to close at $2.30 per ADR on April 10, 2019, damaging investors.

92.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

93.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Indivior securities publicly traded on OTC during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Indivior, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

94.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Indivior securities were actively traded on OTC. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

95.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

96.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

97.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business Indivior;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Indivior to issue false and misleading public filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false public filings;

41

- whether the prices of Indivior' securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

98.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

99.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Indivior ADSs were sponsored by the Company and represented Indivior ordinary shares, which were listed and actively traded on the London Stock Exchange, a highly efficient and automated market;

- As a public issuer, Indivior filed periodic public reports;

- Indivior regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and

> through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
> •  Indivior was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

100.  Based on the foregoing, the market for Indivior securities promptly digested current information regarding Indivior from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

101.  Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

102.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103.   This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

104.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

105.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Indivior securities during the Class Period.

106.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Indivior were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Indivior, their control over, and/or receipt and/or modification of Indivior's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Indivior, participated in the fraudulent scheme alleged herein.

107.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Indivior personnel to members of the investing public, including Plaintiff and the Class.

108.    As a result of the foregoing, the market price of Indivior securities was artificially inflated during the Class Period. In ignorance of the falsity of

Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Indivior securities during the Class Period in purchasing Indivior securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

109.    Had Plaintiff and the other members of the Class been aware that the market price of Indivior securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Indivior securities at the artificially inflated prices that they did, or at all.

110.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

111.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Indivior securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

112.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113.   During the Class Period, the Individual Defendants participated in the operation and management of Indivior, and conducted and participated, directly and indirectly, in the conduct of Indivior's business affairs. Because of their senior positions, they knew the adverse non-public information about Indivior's misstatement of revenue and profit and false financial statements.

114.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Indivior's financial condition and results of operations, and to correct promptly any public statements issued by Indivior which had become materially false or misleading.

115.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Indivior disseminated in the marketplace during the Class Period concerning Indivior's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Indivior to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Indivior within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Indivior securities.

116.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Indivior.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

(a)   declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)   awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)   awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:        September 30, 2019                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
Daniel Tyre-Karp (not admitted)
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*