**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL VAN DORP, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>INDIVIOR PLC, SHAUN THAXTER, MARK CROSSLEY, and CARY J. CLAIBORNE,<br><br>    Defendants. | Case No: 2:19-CV-10792-ES-MAH<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

i

**TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT ................................................................1

II. STATEMENT OF FACTS ..................................................................8

    A.  The Parties...........................................................................8

    B.  Defendants' Criminal Scheme to Increase Suboxone Film
        Revenues ..............................................................................9

        1.  Defendants' Make Materially False Statements to the
            FDA to Delay Generic Competition. ......................................12

        2.  Defendants Increase Profits By Illegally Incentivizing
            Health Care Providers to Prescribe and Dispense
            Suboxone Film In Unsafe and Clinically Unwarranted
            Manner ................................................................................12

    C.  Defendants' Mislead Investors About Their Health Care Fraud
        and Liability ..........................................................................14

        1.  Defendants Assure Investors Of the Company's
            Compliance ..........................................................................14

        2.  Defendants Misleadingly Warn About Materialized Risks......16

        3.  Defendants Misled Investors About The Relative Safety
            Of Suboxone Film and the Company's Reason For
            Attempting To Withdraw Suboxone Tablets............................17

        4.  Defendants Fail to Disclose Estimates Of Potential
            Losses. ................................................................................18

    D.  The Truth Begins to Emerge .............................................19

        1.  Indivior Increases Its Reserves .............................................19

        2.  Indivior Is Indicted For Health Care Fraud. ...........................19

    E.  Post-Class Period Events....................................................21

III. ARGUMENT ................................................................................21

    A.  THE COMPLAINT ADEQUATELY ALLEGES THAT
        DEFENDANTS MADE ACTIONABLE MISSTATEMENTS........22

        1.  Defendants Misled Investors About Indivior's
            Compliance ..........................................................................23

2.    Defendants' Risk Disclosures Were False And
      Misleading.................................................................30

3.    Defendants Misled Investors About The Relative Safety
      of Suboxone Film.......................................................30

4.    Defendants Misled Investors About The Scope Of the
      Company's Liability For Its Illicit Scheme ............................33

B.    THE COMPLAINT ALLEGES A STRONG INFERENCE OF
      SCIENTER ...................................................................35

1.    The Complaint Pleads A Strong Inference That Thaxter
      Had Actual Knowledge That His Public Statements Were
      Not Accurate ..............................................................36

2.    The Complaint Pleads a Strong Inference Of Scienter
      Against Claiborne and Crossley ........................................38

IV.   CONCLUSION...............................................................40

# TABLE OF AUTHORITIES

Page(s)

Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................22

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................ 22, 23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................22

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
  No. CV 17-10467, 2019 WL 3451523 (D.N.J. July 31, 2019) ...........................41

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ....................................................................29

*Exch. Comm'n v. RPM Int'l, Inc.*,
  282 F. Supp. 3d 1 (D.D.C. 2017) .............................................................35

*Foman v. Davis*,
  371 U.S. 178 (1962) ................................................................................41

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) ....................................................................35

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................... 25, 27

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017) ............................................... 28, 29

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ....................................................... 23, 36, 38

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 216CV06509WHWCLW,
  2018 WL 3772675 (D.N.J. Aug. 8, 2018)..................................................24

iv

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017) ......................................................... 25, 29

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) ...........................................................30

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ...........................................................40

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
    No. CIV.A. 05-1151 SRC, 2011 WL 3444199 (D.N.J. Aug. 8, 2011) ......... 23, 32

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) ...........................................................25

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) ...........................................................40

*In re Viropharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014) ..............................................................41

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ..........................................................................35

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27, 131 S. Ct. 1309 (2011) .............................................................22

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017) ...........................................................35

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ..................................................................... 25, 38

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
    142 F. Supp. 2d 589 (D.N.J. 2001) ...............................................................41

*Rochez Bros. v. Rhoades*,
    527 F.2d 880 (3d Cir. 1975) ..........................................................................41

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019) ...................................................26

*Simon v. FIA Card Services, N.A.*,
    732 F.3d 259 (3d Cir. 2013) ...............................................................22

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) ................................................................29

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    No. 17-CV-8457 (JMF), 2019 WL 4094559 (S.D.N.Y. Aug. 29, 2019) .............32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................36

*United States v. Indivior Inc.*,
    No. 1:19CR00016, 2019 WL 6039969 (W.D. Va. Nov. 14, 2019) ....................21

*Veltex Corp. v. Matin*,
    No. CV 10-1746 ABC PJWX, 2010 WL 3834045 (C.D. Cal. Sept. 27, 2010) ...33

*Voit v. Wonderware Corp.*,
    977 F. Supp. 363 (E.D. Pa. 1997)..........................................................30

Statutes

15 U.S.C. § 78u-4(b)(1)(B)................................................................22

Rules

Fed. R. Civ. P. 15(a)(2) .....................................................................41

## I.    PRELIMINARY STATEMENT

The well-pleaded facts in this case demonstrate securities fraud: Defendants[1] made material misstatements about Indivior's legal and regulatory compliance while orchestrating a multi-billion dollar health care fraud, misleadingly warned investors about risks that had already materialized, repeated the central lie of their health care fraud to investors, and failed to provide investors with an estimate of the Company's potential liability or warn investors that the Company could be excluded from government programs as part of a settlement. Those misstatements misled the market and investors, artificially inflating the price of Indivior's securities. The price of those securities came crashing back to reality in April 2019, when Indivior was criminally indicted for health care fraud, wire fraud, and mail fraud.

Indivior is a pharmaceutical company that specializes in the treatment of opioid dependence. Indivior operated as a wholly owned subsidiary of Reckitt Benckiser Group PLC until being spun off into a separate company in 2014. In October 2002, the FDA approved Reckitt's application for the first buprenorphine-containing drugs for the treatment of opioid dependence: Suboxone Tablets and Subutex Tablets. Indivior had the exclusive right to market and distribute these drugs in the United States for seven years before any competitors would be allowed on the market.

---

[1] Defendants are Indivior PLC ("Indivior" or the "Company"), Shaun Thaxter ("Thaxter"), Mark Crossley ("Crossley") and Cary J. Claiborne ("Claiborne") (the "Individual Defendants" and, together with Indivior, "Defendants").

1

By 2007, Indivior was generating over $260 million per year in revenue from Suboxone Tablets. Fearing that it would lose most of this revenue once competitors were allowed on the market, Defendants hatched a scheme to switch patients to a new film version of Suboxone that would enjoy a new exclusivity period free from competition.

First, even before the FDA approved Suboxone Film in August 2010, Defendants repeatedly told health care providers and health care benefit program— in direct presentations and marketing materials—that Suboxone Film was safer for children, less divertible, and less abusable than other opioid-addiction treatment drugs.

Second, Indivior sought to boost profits even further by using its "Here to Help" program to connect opioid-addicted patients to doctors who were willing to prescribe Suboxone Film. The Company also revamped its incentive system for its salespeople to reward film sales instead of tablet sales.

Third, Indivior withdrew Suboxone Tablets from the market due to "increasing concerns regarding pediatric exposure." This discontinuance forced the FDA to delay approval of generic tablets while safety tests were conducted.

Indivior's efforts were incredibly successful. Suboxone Film dominated the opioid dependence treatment market and led to billions of dollars in revenues for Indivior. But, as detailed in an April 9, 2019, criminal indictment of Indivior, this

entire scheme was a massive criminal fraud that endangered patients, deceived health care providers, drained funds from Medicare and Medicaid, and harmed investors.

Internal Indivior documents collected by investigators exposed that Defendants knew that there was no scientific basis for its claims that Suboxone Film was safer for children, less divertible, and less abusable than other opioid-addiction treatment drugs. Indeed, Defendants knew that Suboxone Film was—in many ways—*more* dangerous for children and *more* susceptible to diversion. Despite internal acknowledgement of these falsehoods within the Company, corrections were never issued to patients, providers, or investors.

Further, the Company's Here to Help program was sending opioid-addicted patients to doctors it knew were prescribing Suboxone and other opioids to more patients than allowed by federal law, at high doses, and in a careless and clinically unwarranted manner. Indivior continued referring patients to physicians it knew were illegally prescribing Suboxone Film until at least December 2016.

Finally, Defendants' discontinuance of Suboxone Tablets—announced in 2012 and completed in 2013—was not based on any real concern for child exposure.

Rather, the Company used the discontinuance as a way to delay generic versions of the tablets from entering the market.

The opioid epidemic has killed tens of thousands of Americans per year and torn apart countless families. As those struggling with addiction and dependence sought treatment, Indivior funneled them to crooked doctors the Company knew were prescribing Suboxone to more patients than allowed by federal law, at dangerously high doses, and in suspect circumstances. Indivior fed misinformation to patients, healthcare providers, the government, and investors all to line Defendants' pockets. The Company never corrected its materially false statements about Suboxone Film. The Company never disclosed to investors that its Suboxone Film revenues were the product of a massive criminal fraud. Nor did the Company disclose the extent of its liability stemming from the governmental investigations into Indivior—including the Department of Justice investigation that began in December 2013. Instead, throughout the Class Period, the Company repeatedly touted its compliance with the Company's Code of Business Conduct, assured investors it complied with applicable laws, and continued to mislead investors about the pediatric safety of Suboxone Film relative to Suboxone Tablets.

Defendants revealed a small portion of the truth on February 15, 2018, when the Company announced that it had increased its provision for investigative and antitrust litigation matters by $185 million to $438 million, causing the price of

4

Indivior's ADRs to decline by 5.8% from $28.14 to $26.51. Unbeknownst to investors, the $438 million charge paled in comparison to Indivior's liability for its billions of dollars of illicit Suboxone revenue. Further, the Company still failed to disclose that it faced exclusion from Medicare and Medicaid programs as a result of its criminal conduct—a consequence that would be fatal to its business. On July 11, 2019, the Department of Justice announced that it had reached a $1.4 billion resolution with Reckitt related its role in Indivior's misconduct prior to the 2014 demerger—providing a picture of how significantly insufficient Indivior's loss reserves were at the time.

The full truth was finally revealed on April 9, 2019, when the Department of Justice filed a federal grand jury indictment charging Indivior with conspiracy to commit wire fraud, mail fraud, and health care fraud; one count of health care fraud; four counts of mail fraud; and twenty-two counts of wire fraud. The indictment stated that Indivior would be required to forfeit at least $3 billion, several business units, and several patents upon conviction. The indictment extensively details the multiyear nationwide fraud by citing and quoting internal Company communications and communications with regulators, health care providers, and third-party contractors. The indictment not only conclusively outlines the Company's fraud, it also explicitly shows that CEO Thaxter was intimately involved in every step of the fraudulent scheme—including its planning, execution, and coverup. On this news,

5

Indivior ADRs plummeted $4.48 or more than 66% to close at $2.30 per ADR on April 10, 2019, damaging investors.

The Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint (the "Motion") asserts that the Complaint fails to plead the required elements of falsity and scienter. The Motion is unpersuasive because it relies on inapposite case law and misstates the facts pleaded in the Complaint.

First, the Motion's contention that the Company's compliance-related statements are not actionable because they were merely aspirational fails because many of the challenged statements described present and past events. Statements such as "[w]e comply with the wide array of applicable laws and regulations concerning promotion of our products" and "[t]hese steps ensure adherence to industry codes, laws and regulations in all the countries in which the Group operates" are not aspirational; they are unqualified statements of fact. Further, assuming arguendo that certain of the challenged statements are aspirational, these statements are still actionable because the Complaint adequately alleges that Defendants never had any such aspirations. Rather, Thaxter was orchestrating a company-wide fraud that directly contradicted any stated aspirations of compliance made at the time. Finally, the Motion misleadingly relies on a risk disclosure about the effectiveness

of the Company's compliance with irrelevant anti-bribery laws to argue that investors had been warned about the risk of non-compliance.

Second, the Motion asserts that the challenged statements are not actionable because they were not meant to reassure investors of the Company's compliance in the face of concerns about corporate wrongdoing. But that was precisely the context and purpose of these compliance statements. The Company was facing investigations from the DOJ, SEC, and FTC; lawsuits from state governments, and lawsuits from *qui tam* plaintiffs all alleging the same type of corporate wrongdoing that Defendants were attempting to reassure investors did not exist.

The Motion also challenges the falsity of the Defendants' 2016 claim that its attempted discontinuance of Suboxone Tablets in 2012 was "owing to pediatric safety concerns" and that Suboxone Film had "additional safety and compliance features" compared to Suboxone Tablets. These false statements were at the center of the Company's fraud for which a grand jury indicted Indivior upon probable cause. Internal emails cited in the indictment demonstrate that Defendants were fully aware these claims were false at the time they were made. The Company had already disclosed that it was under investigation for "pediatric safety claims" at the time of

7

this 2016 misstatement. Defendants thus made yet another attempt to falsely reassure investors that the Company was in compliance with applicable laws and rules.

Finally, the Motion asserts that the Company's failure to provide any estimate of its liability, take adequate loss reserves, or disclose the risk of being excluded from participation in government health care programs are not actionable because Defendants never claimed the reserves were sufficient and were not required to speculate about the outcome of the investigation. These arguments are directly contrary to Defendants obligations under applicable accounting standards and securities laws, which require companies to disclose an estimate of reasonably likely losses and to take a reserve of probable losses.

For these reasons, the Motion should be denied.

## II.   STATEMENT OF FACTS

### A.   The Parties

Defendant Indivior was a wholly owned subsidiary of Reckitt Benckiser ("Reckitt"), until demerging into a separate company in December 2014. Indivior sponsors a Level I ADR program in the United States, and its ADRs are publicly traded in the US on the OTC Market under the symbol "INVVY." The value of one Indivior ADR corresponds to the value of five Indivior shares. ¶33.[2]

---

[2] All references to "¶" are to Plaintiffs' Amended Class Action Complaint unless otherwise noted.

8

Defendant Shaun Thaxter ("Thaxter") has served as the Company's CEO and director since November 4, 2014. Thaxter led the pharmaceutical division at Reckitt from 2003 until the 2014 demerger. ¶24.

Defendant Mark Crossley ("Crossley") has served as the Company's CFO and director since February 2017. Crossley previously served as the Company's Global Finance Director from 2012 to 2014 and its Chief Strategy Officer from 2014 to 2017. ¶25

Defendant Cary J. Claiborne ("Claiborne") served as the Company's CFO and a director from November 2014 until February 2017. ¶26.

### B. Defendants' Criminal Scheme to Increase Suboxone Film Revenues

In October 2002, the US Food and Drug Administration (the "FDA") approved Suboxone Tablets for the treatment of opioid addiction, granting Reckitt seven years of exclusivity before generic competitors could enter the market. Indivior marketed and distributed Suboxone Tablets in the United States. ¶ 34. By 2007, Reckitt and Indivior's annual revenue from Suboxone Tablet sales had exceeded $260 million, but the Company forecasted that most of this revenue would disappear when generic versions of Suboxone were allowed on the market in October 2009. ¶ 35.

Indivior hatched a two-pronged strategy to delay and mitigate this impending financial loss. First, the Company began developing a new film version of Suboxone

Tablets ("Suboxone Film") that it believed would be protected by patents. Indivior planned to market Suboxone Film as a safer alternative to Suboxone Tablets. Second, the Company planned to withdraw Suboxone Tablets from the market using safety concerns as a pretext, triggering an FDA safety review that could delay generic versions of Suboxone Tablets from hitting the market for as long as a year. Thaxter told Reckitt executives in January 2010 that "[o]ur immediate focus is to get the FDA approval for [Suboxone Film] asap to switch the business ahead of the generic." ¶ 36.

On March 29, 2010, the FDA wrote a letter to Indivior rejecting the Company's claim that Suboxone Film's packaging protected against accidental child exposure. Further, the FDA explained that Suboxone Film was even more dangerous to children than Suboxone Tablets because the film cannot be spit out. ¶ 38.

At this point, the Company fully understood that Suboxone Film had attributes that potentially could make it more dangerous to children, including that it could not easily be spit out if accidentally taken by a child; dissolved more rapidly, leaving less time to remove it from a child's mouth before absorption; had potentially a higher bioavailability at certain doses, potentially increasing the severity of an incident; was formulated to taste better, potentially reducing the likelihood that a child would seek to remove it; and could not easily be re-secured in its original

10

packaging, which, unlike a bottle with a child-resistant cap, was not designed to be re-closed. ¶ 39

Immediately following the FDA's approval of Suboxone Film in August 2010, Thaxter assured Reckitt's CEO and CFO that "[w]e will be making the most of every minute between now and generic approval to convert our tablet business to film," including a "Full Blitz campaign for salesforce through Thanksgiving." The "Full Blitz" campaign consisted of Indivior salespeople making sales presentations to physicians touting the "diversion and misuse and pediatric safety" of Suboxone Film relative to tablets, despite knowing that these claims were not supported by scientific studies. ¶ 41. On October 17, 2010, Thaxter told Indivior personnel that performance reviews and incentive programs for salespeople would be revised to reward "film sales only," and that those without adequate film sales might be fired. ¶ 43.

The Indictment details 30 illustrative examples between September 2010 and December 2011 of Indivior sales representatives making false statements to health care providers about the safety and diversion advantages of Suboxone Film to induce them to prescribe, dispense, and/or recommend Suboxone Film. These false statements were provided by sales representatives to their supervisors to be used as models for other sales representatives. ¶ 46. Beginning in December 2011, these written reports detailing sales representatives' false statements to health care

11

providers were discontinued because Indivior's compliance committee determined they were "compliance risks." ¶ 47.

### 1. Defendants' Make Materially False Statements to the FDA to Delay Generic Competition.

Indivior announced in September 2012 that it would discontinue Suboxone Tablets in early 2013 due to its purported safety concerns. The Company sent letters to healthcare professionals informing them of this decision and advising them to switch patients to the film. On March 18, 2013, Indivior discontinued its Suboxone Tablet product. ¶ 48.

In September 2012, Indivior submitted a citizen petition requesting that the FDA reject any generic Suboxone Tablet applications or subject them to additional requirements to delay approval of generics while the FDA reviewed it. The petition misrepresented a study that Indivior had commissioned and falsely claimed that there was evidence that the packaging of Suboxone Film reduced the risk of pediatric exposures. On February 22, 2013, the FDA denied the citizen petition because the data did not support Indivior's claims. ¶ 49. On September 25, 2012, Thaxter approved a press release posted to Reckitt's website stating that Suboxone Tablet was discontinued "due to increasing concerns with pediatric exposure." ¶ 50.

### 2. Defendants Increase Profits By Illegally Incentivizing Health Care Providers to Prescribe and Dispense Suboxone Film In Unsafe and Clinically Unwarranted Manner

12

Under Thaxter's direction, Indivior used a variety of methods to incentivize health care providers to prescribe and dispense Suboxone Film despite knowing that many of these providers were putting patients at risk by prescribing opioid addiction treatments to more patients at a time than allowed by federal law, in daily doses in excess of any clinical indication, and in other careless manners. ¶ 51.

Indivior promoted its "Here to Help" program as a way for patients and potential patients to find and connect with health care providers who prescribe Suboxone. ¶ 52. By July 2010, Defendants were aware that the 564 highest-prescribing physicians—who prescribed buprenorphine-containing drugs to an average of more than 200 patients at a time, well in excess of the 24 allowed under federal law—accounted for one third of Indivior's business. Indivior also received numerous firsthand reports that physicians participating in the Here to Help program were prescribing Suboxone to known drug traffickers, trafficking Suboxone in the parking lots of their offices, and otherwise carelessly prescribing Suboxone. ¶ 53.

Despite this knowledge, the Company continued using its Here to Help program to funnel patients to these problematic physicians. In one particularly glaring example, Indivior repeatedly funneled patients to a Kentucky doctor who prescribed dosages of Suboxone exceeding the maximum clinical indication to far more patients at a time than allowed by federal law. Indivior knew about the doctor's illicit prescribing in 2008, yet the Company continued funneling patients to him as

13

late as December 2016. On June 4, 2012, the Kentucky Board of Medical Licensure indefinitely restricted this doctor's authorization to prescribe Suboxone for opioid dependence. Undeterred, Indivior referred an additional 140 patients to the doctor between June 25, 2012 and December 2, 2016. ¶ 55.

Defendants never disclosed these unlawful referrals to illicit physicians to patients, health care providers, or investors.

### C.     Defendants' Mislead Investors About Their Health Care Fraud and Liability

#### 1.     Defendants Assure Investors Of the Company's Compliance

On March 10, 2015—the first day of the Class Period—the Company disclosed to investors that "Indivior's control environment is supported by a Code of Business Conduct (the "Code"), upon which employees receive training annually." ¶ 60.[3] Throughout the Class Period, Defendants repeatedly reassured investors of the Company's commitment to the Code. *See* ¶ 67 (Our Board has adopted a Code of Business Conduct that describes our commitment to, and requirements in connection with, ethical issues relevant to business practices and conduct"); ¶ 72; ¶ 84 ("Complying with all applicable laws and regulations, including engaging in commercial activities that are consistent with legal and

---

[3] The Code of Business Conduct, effective December 2014, is attached as Exhibit 1 to the Declaration of Laurence Rosen filed concurrently with this memorandum.

industry standards, and our Group's Code of Conduct are core to the Group's mission, culture and practices.")

In addition to verbalizing the Company's principles, the Code detailed policies and controls that purportedly ensured compliance with applicable laws and regulations. Unbeknownst to investors, the Code bore zero resemblance to the actual business practices of the Company either at the time the Code was adopted or at the time of the public filings assuring investors that the Company was in compliance with the Code.

In the section entitled Interactions With Healthcare Professionals, the Code states that the Company "act[s] responsibly and with integrity and interact[s] with HCPs in accordance with applicable laws when providing information about our products, which are at all times intended to provide up-to-date data regarding the use of our products and associated benefits to consumers" and "promote[s] dissemination of information based on empirical results and do not allow business pressures to influence our interactions with HCPs." ¶ 57. At Thaxter's direction, however, the Company made "materially false and fraudulent statements and representations to health care providers" about Suboxone Film's pediatric safety, diversion, and misuse "to induce them to prescribe, dispense, and recommend Suboxone Film." ¶ 87; *see also* ¶¶ 41-47. The Company also allowed business pressures to dictate its interactions with health care professionals by including

15

"physicians it knew were issuing careless, clinically unwarranted opioid prescriptions in the Here to Help program." ¶ 88.

In the section entitled Product Promotion, the Code states that the Company "compl[ies] with the wide array of applicable laws and regulations concerning promotion of our products." ¶ 57. More specifically, the Code states that the Company's "strict policy is to solicit and obtain business only through marketing programmes that have been reviewed and approved by the Company" and that its "promotions comply with applicable standards and regulations." Code § 7.3. Contrary to these assertions, the Company distributed "materially false and fraudulent marketing materials promoting Suboxone Film" at Thaxter's direction. ¶¶ 45-46, 87.

In the section entitled Compliance With This Code, the Company vowed that no employee or contractor would "suffer any adverse employment or contract decision for abiding by this Code." ¶ 57; Code § 18.4. However, Thaxter implemented "performance appraisals and incentive programs for salespeople to reward 'film sales only,'" which punished employees who abided by the Code by telling health care providers the truth about pediatric safety, diversion, and misuse of Suboxone Film. Thaxter also threatened to fire salespeople who did not sell sufficient amounts of the film product. ¶¶ 43, 89.

### 2.    Defendants Misleadingly Warn About Materialized Risks

16

In the "Risk Factors" sections of its annual reports, Defendants repeatedly warned investors that a "[f]ailure to comply with applicable laws and rules and regulations in any jurisdiction may result in fines, civil and/or criminal legal proceedings." ¶¶ 61, 65, 73, 79, 84. Defendants failed to disclose that the Company's failure to comply with the law was not a potential risk, but the reality. As detailed in the Complaint and the Indictment, the Company was committing health care fraud and mail fraud at the time these purported risk factors were communicated to investors. *See, e.g.*, Indictment ¶¶ 112, 142.

### 3. Defendants Misled Investors About The Relative Safety Of Suboxone Film and the Company's Reason For Attempting To Withdraw Suboxone Tablets

The Company's 2016 Form 20-F/A repeated the same false and misleading statements that led to the Company's indictment. The Company stated that it "announced that we were discontinuing distribution of SUBOXONE Tablet in the U.S. market in September 2012 owing to pediatric safety concerns." ¶ 68; *see also* Haney Decl. Ex. E (Aug. 24, 2016 Indivior Form 20-F/A) at 59 ("In March 2013, we voluntarily withdrew SUBOXONE Tablet from the market due to pediatric safety concerns."). As detailed in the Complaint and the Indictment, Defendants knew that "the primary reason for the discontinuance was to delay FDA approval of generic Suboxone" and that any "claim that Suboxone Film is safer or better at reducing pediatric exposures" is unsubstantiated. ¶¶ 87-88.

17

The Company's 2016 Form 20-F/A also repeated the false and misleading statement that "SUBOXONE® Film was developed as an alternative to the sublingual tablet with the intention of producing similar safety and efficacy to SUBOXONE® Tablet, but with additional safety and compliance features." As detailed in the Complaint and Indictment, the Company developed Suboxone Film because they feared their revenue from Suboxone Tablets would evaporate as soon as generics hit the market. The Company falsely marketed Suboxone Film as having additional safety and compliance features, despite knowing these claims were false, to induce providers and patients to switch from Tablets to Film. ¶¶36, 38-39, 87, As Thaxter said in January 2010, "[o]ur immediate focus is to get the FDA approval for [Suboxone Film] asap to switch the business ahead of the generic." ¶ 36.

### 4.    Defendants Fail to Disclose Estimates Of Potential Losses

The Company's disclosures about the risks of the Investigation—and the general risk of failing to comply with applicable laws—did nothing to warn investors that the Company could be excluded from receiving reimbursements from government healthcare programs even it were able to resolve the Investigation. ¶¶ 62, 66, 69, 74, 80, 82, 85. Such an exclusion would cripple the Company's entire business. Nor did the Company provide an estimate of its potential losses as a result of the Investigation. *Id*.

In April 2019, this undisclosed risk materialized when the Company was criminally indicted. In May 2019, Indivior disclosed that it was unable to resolve the Investigation because of the government's insistence that "the proposed resolution could likely result, in HHS/OIG's view, in exclusion" from government healthcare programs.[4]

### D.    The Truth Begins to Emerge

#### 1.    Indivior Increases Its Reserves

On February 15, 2018, the Company issued its Final Results for 2017. Among other things, the 2016 3rd Quarter Results disclosed that the Company had increased its provision for investigative and antitrust litigation matters by $185 million to $438 million. ¶ 74. That same day, the Company held a conference call with analysts to discuss its 2017 Final Results. In his opening remarks, Thaxter attempted to minimize the significance of the Company's $438 million charge, stating "I do, in the interest of transparency, want to make sure that you're aware of the adjustment that we made to our legal provision. . . . . But the real news, the exciting news for the future of our company, of course, is the approval of SUBLOCADE." ¶ 75. The market reacted swiftly to this news, as the price of Indivior's ADRs declined by 5.8% from $28.14 to $26.51. ¶ 76.

#### 2.    Indivior Is Indicted For Health Care Fraud.

---

[4] Indivior's Q1 2019 Results, dated May 2, 2019, are attached as Exhibit 2 to the Rosen Declaration.

On April 9, 2019, the DOJ filed an indictment asserting criminal charges against Indivior in connection with the Company's conduct in marketing Suboxone Film (the "Indictment"). The charges included one count of conspiracy to commit mail, wire, and health care fraud, one count of health care fraud, four counts of mail fraud, and twenty-two counts of wire fraud. The Indictment described the fraudulent marketing scheme in extensive detail, providing numerous examples of misconduct, including:

> Beginning in or about 2010, Indivior executed an illicit nationwide scheme to increase prescriptions of Suboxone Film. In particular, Indivior illegally obtained billions of dollars in revenue from Suboxone Film prescriptions by deceiving health care providers and health care benefit programs into believing that Suboxone Film is safer and less susceptible to diversion and abuse than other, similar drugs. Indivior further sought to boost its profits from Suboxone Film by establishing a telephone program for patients to call to be connected with a doctor for opioid addiction/dependence treatment, which Indivior used to connect patients to doctors Indivior knew were prescribing Suboxone and/or other opioids in a careless and clinically unwarranted manner. Indivior's fraudulent scheme lasted for years and hindered patients', health care providers', and health care benefit programs' accurate assessments regarding opioid-addiction treatment in order to increase the company's profits.

¶ 87. According to the Indictment, Indivior executives were aware that Suboxone Film was being carelessly overprescribed by several doctors but Indivior continued to target those doctors in their tailored marketing. ¶¶ 88-89. Citing internal emails and Company documents, the Indictment demonstrates that Indivior executives and

20

managers were not just aware of the fraud, but that it had been carefully planned and executed by Thaxter. ¶ 89.

The Indictment also provided a Notice of Forfeiture, stating that upon conviction of one or more of the felony counts in the indictment, property would be forfeited to the United States, including a monetary judgment of "not less than $3,000,000,000," seven business entities including all assets, inventory, and property related thereto, and several bank accounts, trademarks, and patents. ¶ 90.

On this news, Indivior ADRs plummeted $4.48, or more than 66%, to close at $2.30 per ADR on April 10, 2019, damaging investors. ¶ 91.

### E.   Post-Class Period Events

Indivior pleaded not guilty to the Indictment's charges in May 2019. The Government obtained a superseding indictment in August 2019, and Indivior's motion to dismiss the Indictment was denied on November 14, 2019. *United States v. Indivior Inc.*, No. 1:19CR00016, 2019 WL 6039969, at *1 (W.D. Va. Nov. 14, 2019). Indivior subsequently filed a second motion to dismiss the Indictment, which the government has opposed.

## III.   ARGUMENT

"Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations 'could not

21

raise a claim of entitlement to relief.'" *Simon v. FIA Card Services, N.A.*, 732 F.3d 259, 264 (3d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter…to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 131 S. Ct. 1309, 1322-23 (2011) (same).

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission ("falsity"); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx*, 131 S. Ct. at 1317. The Complaint adequately alleges all of these required elements, and Defendants contest only falsity and scienter.

## A. THE COMPLAINT ADEQUATELY ALLEGES THAT DEFENDANTS MADE ACTIONABLE MISSTATEMENTS

The "fundamental purpose" of the Exchange Act is to implement "a philosophy of full disclosure," and defendants are liable under §10(b) for affirmative misstatements and material omissions. *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). Under Rule 9(b) and the PSLRA, a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Moreover, "[s]ome statements, although literally accurate, can become through their context

22

and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers." *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, No. CIV.A. 05-1151 SRC, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011). The misstatements or omissions alleged also must be material. An omitted fact is material if there is a substantial likelihood that a reasonable investor would have viewed its disclosure "as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 232. "In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).

### 1.    Defendants Misled Investors About Indivior's Compliance

Throughout the Class Period, Defendants constantly assured investors that the Company fully complied with all relevant regulations and laws and its own code of conduct. The Company's disclosures were detailed, specific, unqualified, and knowingly false. In reality, Defendants were engaged in a multi-billion dollar health care fraud that lasted until at least December 2016.

Defendants assured investors that the Company's "policies, training education and monitoring . . . ensure adherence to industry codes, laws and regulations in all the countries in which the Group operates." ¶78. The steps the Company purportedly

23

took to "ensure adherence" to applicable laws and regulations were detailed in the Company's Annual Reports and Code of Business Conduct. ¶¶60, 67, 78, 84.

For example, Defendants assured investors throughout the Class Period that Indivior's employees "interact with [health care professionals] in accordance with applicable laws when providing information about our products" and "do not allow business pressures to influence our interactions with HCPs." ¶57. At the same time Defendants were making these assurances, they were orchestrating a wide-ranging scheme to make "materially false and fraudulent statements and representations to health care providers" about the relative safety of Suboxone Film "to induce them to prescribe, dispense, and recommend Suboxone Film." ¶87; *see* also *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 216CV06509WHWCLW, 2018 WL 3772675, at *20 (D.N.J. Aug. 8, 2018) ("At the time that [defendant] was making statements highlighting its anticorruption training, it was allegedly engaged in a bribery scheme involving members of senior management."). Further, the Company explicitly allowed business pressures to influence its interactions with doctors. Under Thaxter's direction, the Company revised its performance appraisals and incentive programs for salespeople to reward "film sales only," which essentially rewarded Indivior's salespeople for lying to doctors about the relative safety of Suboxone Film. *Id.* The Company's Code of Business Conduct also stated that no "employee or contractors suffer any adverse employment or contract decision for

24

abiding by this Code." ¶57. However, under Thaxter's direction, employees would receive worse performance reviews, lower compensation, and were threatened with employment termination for following the Code's promise to provide doctors with honest and fulsome information about Indivior's products. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) ("the defendants knowingly sanctioned procedures that violated the Company's own markdown policy, as stated in the Company's public filings. . . . caus[ing] those filings to be materially misleading in that the disclosed policy no longer reflected actual practice.")

When viewed holistically, and in the context of the DOJ's ongoing investigation of the Company for health care fraud, these statements materially misled investors about the Company's ongoing misconduct. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 659–61 (S.D.N.Y. 2017) ("while at least some of the statements in this category may be mere puffery when viewed in isolation, context shows they were made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern, and that therefore 'a reasonable investor could rely on them as reflective of the true state of affairs at the Company'") (quoting *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015)); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) ("as news continued to trickle out about further evidence implicating [defendant] in the bribery and bid-rigging investigation, [defendant]

25

repeatedly emphasized and reasserted the strength of its internal controls and its commitment to transparency and ethical conduct.")

The Motion makes a variety of arguments attempting to dismiss these misstatements as "inactionable puffery." Motion at 25-26. These arguments fail because they are based on inapposite case law and misstated facts about Indivior's disclosures.

First, the Motion argues that "[c]ourts have found compliance-related statements actionable only in limited circumstances, such as where the statements 'go beyond aspirations or general puffery into the realm of false representations of past or present compliance with such policies.'" Motion at 27 (quoting *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 298 n.5 (S.D.N.Y. 2019)). The Motion then argues that "[t]his exception does not apply because Indivior made no representations of compliance." Motion at 27. Defendants are mistaken; Indivior repeatedly made representations of past and present compliance. See ¶57 ("We act responsibly and with integrity and interact with HCPs in accordance with applicable laws when providing information about our products"); *Id.* ("We comply with the wide array of applicable laws and regulations concerning promotion of our products."); ¶78 ("Regulatory and legal compliance is a key aspect of the Group's patient focused business model. The Group maintains a Corporate Compliance Department to guide compliance efforts through policies, training education and

26

monitoring. ***These steps ensure adherence to industry codes, laws and regulations in all the countries in which the Group operates***.") (emphasis added); *id.* ("These procedures did not discover any material instances of non-compliance with the Group's business conduct policies and procedures during the year").

Further, even if these misstatements were merely aspirational, "investors could have relied at least on the notion that the Company held such aspirations." *Banco Bradesco*, 277 F. Supp. 3d, at 660. As the Complaint and the Indictment make clear, the Company never had any such aspirations. *See Id.* ("alleging that executives in the highest echelons of the Company were actively involved in bribing a government official during the time these statements were made, Plaintiff has adequately alleged that no such aspirations were at play"). This is not a case where a company's compliance polices failed to prevent a rogue employee from breaking the law; here, the executives assuring investors that the Company complied with all laws were the ones directing the fraudulent scheme.

Finally, the Motion's repeated insistence that "the Company's Class Period disclosures warned that there can be 'no assurance that our required policies and procedures will be followed at all times or will effectively detect and/or prevent violations of applicable compliance regimes by our employees, consultants, subcontractors, agents and partners'" is particularly misleading. Motion at 27; *see also* Motion at 14, 29. The "warning" the Motion relies on has nothing to do with

27

the compliance statements at issue in this litigation; rather, it is a risk disclosure about the Company's compliance with "applicable anti-corruption and anti-money laundering regulation." Haney Decl. Ex. E (Aug. 24, 2016 Indivior Form 20-F/A) at 26.[5] If anything, the fact that Defendants gave investors this warning about its "procedures and controls for preventing bribery and money laundering," but did not provide any such warning about its compliance with the laws and policies related to the Indictment, provides further evidence that reasonable investors could rely on the Company's relevant assurances.

Second, the Motion argues that the challenged statements are non-actionable because they were not made "in an effort to 'parry, and reassure investors in the face of, growing concerns about corporate wrongdoing . . . .'" Motion at 28 (quoting *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 757 (S.D.N.Y. 2017)). In fact, all of the challenged statements were made in effort to reassure investors as the Company faced growing concerns about corporate wrongdoing. The Code became effective after the Company had already disclosed that it was facing a DOJ investigation, and Defendants' assurances regarding the Company's compliance came as the Company was facing allegations of similar misconduct from states and *qui tam* plaintiffs. "Accordingly, there was a substantial likelihood that

---

[5] Even if this "warning" were about the compliance policies at issue in this action, the purported warning was only included in one of the many challenged statements.

these statements, made to reassure investors, would be important to a reasonable person in considering whether to buy or sell" Indivior securities. *Eletrobras*, 245 F. Supp. 3d, at 463–64.

Third, the Motion argues that the misstatements were "too general to cause a reasonable investor to rely upon them." Motion at 25-26. The Motion then cites to several cases in which courts found that generic statements about compliance were non-actionable. *Id.* ("general statements about reputation, integrity, and compliance with ethical norms"); *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019) ("generic assertions about having 'policies and procedures' and allocating 'significant resources'"); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 755 (S.D.N.Y. 2017) ("broadly touted [defendant's] 'trustworth[y]' culture, its commitment to 'integrity,' its 'compliance with the laws,' its 'fundamental values such as transparency, ethics, clarity of information and responsibility for Supply decisions,' *id.* ¶ 78, and its commitment to 'transparency and good corporate governance practices,'") (internal citations omitted). These cases are inapplicable, here, where the misstatements made specific assertions about its business practices that were at odds with the Company's ongoing health care fraud. *See, e.g.*, ¶57 ("We act responsibly and with integrity and interact with HCPs in accordance with applicable laws when providing information about our products, which are at all

29

times intended to provide up-to-date data regarding the use of our products and associated benefits to consumers and to the larger public.").

### 2. Defendants' Risk Disclosures Were False And Misleading

Defendants purported to warn investors that a "[f]ailure to comply with applicable laws and rule and regulations . . . may result in fines, civil and/or criminal proceedings." ¶¶ 61, 65, 73, 79, 84. These purported risk disclosures are actionable misstatements because they could be interpreted by a reasonable investor as an assurance that the Company had not failed to comply with applicable laws and regulations—when, in fact, Defendants were fully aware at the time of these purported warnings that the Company was engaging in a massive health care fraud. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Voit v. Wonderware Corp.*, 977 F. Supp. 363, 371 (E.D. Pa. 1997), *abrogated by In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("The warnings only warned what might occur if certain contingencies were met; the disclosures did not make clear that such contingencies had, in fact, already occurred.").

### 3. Defendants Misled Investors About The Relative Safety of Suboxone Film

30

In its 2016 Form 20-F/A, Defendants misled investors about the safety of Suboxone Film relative to Suboxone Tablets—one of the false and misleading claims that led to the Company's indictment:

> We announced that we were discontinuing distribution of SUBOXONE® Tablet in the U.S. market in September 2012 owing to pediatric safety concerns. . . . SUBOXONE® Film was developed as an alternative to the sublingual tablet with the intention of producing similar safety and efficacy to SUBOXONE® Tablet, but with additional safety and compliance features.

As detailed throughout the Complaint and the Indictment, Defendants were fully aware that (i) the Company used pediatric safety concerns as a pretext to withdraw Suboxone Tablets from the market, while the "primary reason for the discontinuance was to delay FDA approval of generic Suboxone;" and (ii) there was no evidence of Suboxone Film was safer than Suboxone Tablets. ¶89 ("INDIVIOR's and Company A's respective chief executive officers approved the press release, even though they knew the primary reason for the discontinuance was to delay FDA approval of generic Suboxone").

The Motion makes several unpersuasive arguments that this statement was neither inaccurate nor materially misleading. Motion at 32-36.

First, the Motion uses linguistic gymnastics to argue that the challenged statement is not actually false. Defendants argue that the first sentence is merely a summary of a prior announcement, ignoring the obvious inference a reasonable investor would draw that the Company would not repeat a materially false claim that

31

it was currently being investigated for. *See, e.g. Merck*, 2011 WL 3444199, at *9 ("[s]ome statements, although literally accurate, can become through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers") (citation omitted). Next, the Motion incredibly argues that "there can be no dispute" that Suboxone Film had additional safety and compliance features compared to Suboxone Tablets, pointing to unit-dose packaging that included serial numbers. Motion at 35. In fact, the FDA explicitly rejected this claim in 2010 (Superseding Indictment ¶¶27), Indivior executives acknowledged that the claim lacked support in internal emails (Superseding Indictment ¶¶24, 28), and a grand jury indicted the Company for spreading this precise untruth (¶87; Superseding Indictment ¶1, 92).

Second, the Motion argues that Defendants' 2016 misstatement is time-barred because Defendants made the same misstatement in 2012. Motion at 34. This argument is contrary to common sense and the law; "[t]he statute of repose begins running from the date of each alleged statement or omission.". *Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17-CV-8457 (JMF), 2019 WL 4094559, at *6 (S.D.N.Y. Aug. 29, 2019); *see also Veltex Corp. v. Matin*, No. CV 10-1746 ABC PJWX, 2010 WL 3834045, at *6 (C.D. Cal. Sept. 27, 2010) ("Each false statement constitutes

32

a separate violation, so the five-year period runs separately for each violation when it occurs.") (citations omitted).

Third, the Motion argues that the challenged statement "was not material because pediatric safety concerns did not affect generic manufacturers' ability to sell competing products." This argument misses the point. Defendants' false statement about the relative pediatric safety concerns of Suboxone Film and Suboxone Tablets was material because the Company was being investigated for, amongst other things, "pediatric safety claims." Haney Decl. Ex. E (Aug. 24, 2016 Indivior Form 20-F/A) at 95; *see also* ¶¶ 7, 13, 38, 41, 45, 49-50, 74, 80, 82, 85.

### 4. Defendants Misled Investors About The Scope Of the Company's Liability For Its Illicit Scheme

Defendants misled investors by failing to provide any estimate of the Company's liability for the DOJ or SEC investigations, failing to reserve sufficient amounts to cover its probable liabilities, and failing to warn investors that it faced potential exclusion from Medicare and Medicaid as part of a settlement with the DOJ.[6] The Company's financial statements violated International Financial Reporting Standards ("IFRS") by failing to recognize a reasonably estimable

---

[6] The Motion points to a risk factor in the Company's 2016 Form 20-F/A generically warning that the Company could be excluded. Motion at 30 & n.4. This disclosure was not tied to the disclosures about the Investigation in the same filing and does not excuse the Company's failure to warn investors in all of the other filings at issue in this action. The same footnote cites Indivior's 2014 Prospectus, which is not at issue in this action.

33

probable loss from a loss contingency, or alternatively, to at least disclose an estimate of the amount or range of such loss. The IFRS standards are codified in IAS 37. IAS 37-25 states that it is "extremely rare" for a company to be unable to estimate a range of possible outcomes that is sufficiently reliable:

> The use of estimates is an essential part of the preparation of financial statements and does not undermine their reliability. This is especially true in the case of provisions, which by their nature are more uncertain than most other items in the statement of financial position. Except in extremely rare cases, an entity will be able to determine a range of possible outcomes and can therefore make an estimate of the obligation that is sufficiently reliable to use in recognising a provision.

Under IAS 37-39, the amount accrued should be either the best estimate of the obligation or, if there is no best estimate, the midpoint of a range. Defendants were aware of the Company's fraud, aware that the Company had produced documents to the government (or had them seized by the government) evidencing the fraud, and had engaged in discussions with DOJ about a potential resolution. There is no plausible explanation for why Defendants failed to provide an estimate or estimated range of possible obligations. *See, e.g., Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 515 (S.D.N.Y. 2017) ("Och–Ziff knew it had violated the FCPA, knew the profits it made off those violations, knew that there was an ongoing FCPA investigation that might end badly, and thus could have reasonably estimated the loss it would incur"); *Sec. & Exch. Comm'n v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 22 (D.D.C. 2017) ("probable and reasonably estimable

34

[defendant] would incur a material loss in connection with the DOJ investigation, because they were aware of the qui tam complaint, had already calculated $11.4 million worth of liability to the government, and had begun discussing settlement options with DOJ").

## B. THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER

To plead scienter, a complaint must allege facts giving rise to a strong inference of "either reckless or conscious behavior." *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir. 1999). "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 280 (3d Cir. 2009) (quoting *Advanta*, 180 F.3d at 535).

The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310, 322 (2007). An inference of scienter is "strong" if it is "cogent and compelling" and "at least as likely as any plausible opposing inference." *Id.* at 324, 328. The inference of scienter need not be more likely than a plausible opposing

35

inference; in such an instance, the tie goes to the plaintiff. *Id.* at 324. Indeed, scienter can be inferred from "circumstantial evidence." *Burlington*, 114 F.3d at 1418.

### 1. The Complaint Pleads A Strong Inference That Thaxter Had Actual Knowledge That His Public Statements Were Not Accurate

The Complaint alleges that Thaxter concocted, planned, and executed the fraud at the center of this action as CEO of Indivior both before and after it was spun off from Reckitt. The Complaint and the Indictment cite numerous internal Company emails and documents demonstrating that Thaxter knowingly made—and directed the Company and its employees to make—false and misleading statements to patients, healthcare providers, the government, and investors:

- On or about January 22, 2010, Thaxter told Reckitt executives, "Our immediate focus is to get the FDA approval for [Suboxone Film] asap to switch the business ahead of the generic." (¶ 89);

- On or about August 30, 2010, the FDA approved Suboxone Film, including the REMS and prescribing information for the drug. None of these materials stated that Suboxone Film was safer than alternative drugs such as tablets, or reduced the risk of misuse, abuse, diversion, or accidental child exposure. Nevertheless, Thaxter planned a full blitz campaign to raise "diversion and misuse and pediatric safety."(*id.*);

- On or about October 17, 2010, Thaxter told Indivior personnel to revise the performance appraisals and incentive programs for salespeople to reward "film sales only." He stated that Indivior's salespeople had "every possible resource to enable them to generate demand for a scheduled narcotic that is being given away for free to an addicted population," and those without "adequate film sales" may be fired. (*id.*);

- In or about July 2012, at a Reckitt investor presentation, Thaxter materially falsely and fraudulently stated that Suboxone Film was "less divertable and abusable." (*id.*);

36

- On or about September 18, 2012, Indivior and Reckitt sent a "Notice of Discontinuance" of Suboxone Tablet to the FDA, stating that the reason for the discontinuance was "increasing concerns regarding pediatric exposure to" Suboxone Tablet. Thaxter approved the notice, even though he knew the primary reason for the discontinuance was to delay FDA approval of generic Suboxone. (*id.*);

- On or about November 17, 2013, Thaxter stated to an Indivior manager that in switching physicians, pharmacists, health care benefit programs, and others to Suboxone Film, Indivior had achieved "the best format conversion ever in the history of the industry." (*id.*).

Allegations that Thaxter directed the illegal scheme and made material misstatements to investors and regulators—allegations found to have probable cause by a grand jury—are more than sufficient to allege a strong inference of scienter. *See, e.g., Novak* 216 F.3d, at 311 ("inference may arise where the complaint sufficiently alleges that the defendants . . . engaged in deliberately illegal behavior"). The Motion fails to put forth any non-fraudulent competing inference, much less one as strong as the fraudulent one.

Defendants also knew or were reckless in not knowing that the Company's estimated losses should have been disclosed under IFRS standards and that the losses were estimable. *See* 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(7). The Complaint alleges scienter than can be imputed to the Company. To allege scienter of a corporate defendant, "a plaintiff need not name a specific individual who acted with the requisite scienter — she need only plead facts that create a strong inference that someone whose intent could be imputed to the

37

corporation did so. *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *25 (S.D.N.Y. Dec. 2, 2013); *see also Ambac*, 693 F. Supp. 2d, at 265 ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority.") (citations omitted).

### 2. The Complaint Pleads a Strong Inference Of Scienter Against Claiborne and Crossley

The Complaint pleads facts that, considered holistically, create a strong inference of recklessness for both Crossley and Claiborne. Several red flags should have alerted Claiborne and Crossley to the ongoing fraud at Indivior, each had a responsibility to investigate these red flags, and each had access to internal documents and information sufficient to inform them of the fraud. "[A]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." *Novak*, 216 F.3d at 308 (citation omitted).

For each Annual Report, the Board "confirms that reviews of the appropriateness and effectiveness of the system of internal control and risk management throughout the period from demerger and up to the date of approval of the Annual Report have been satisfactorily completed in compliance with provision C.2.1 of the [UK Corporate Governance Code]." ¶ 60. Given the numerous red flags that existed, any reasonable review by the Board would have uncovered the ongoing fraud:

38

- As early as December 2011, Indivior's compliance committee "determined that Indivior's salespeople's written reports of their promotional statements to physicians and pharmacists" misstating the relative safety of Suboxone Film "posed 'compliance risks,' and discontinued the reports, without correcting or retracting the promotional statements reflected in the reports." ¶¶ 47, 87; Indictment ¶ 74.

- The FTC and the New York Attorney General opened investigations of Indivior "focusing on business practices relating to Suboxone Film, Suboxone Tablet and Subutex Tablet, including alleged involvement in a scheme to delay FDA approval of generic versions of Subutex Tablet." Motion at 15; Haney Decl. Ex. F (2014 Annual Report) at 90.

- The criminal grand jury investigation of Indivior had begun in December 2013. ¶¶ 13, 62, 63, 66, 74, 80, 82, 85.

- By 2016, Indivior had been sued by 41 states and the District of Columbia alleging antitrust and consumer protection violations for much of the same conduct at issue in this action. The Company had also been served with subpoenas from the Connecticut Attorney General and the California Department of Insurance. Haney Decl. Ex. J (2017 Annual Report) at 46.

Crossley and Claiborne would have been reckless to ignore these red flags. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 406 (S.D.N.Y. 2005) The facts here are similar to those in *Van der Moolen*: the plaintiffs alleged that two members of a management board recklessly ignores red flags in the form of two NYSE reports alleging NYSE rules violations by a subsidiary *Id.* The defendants argued that the reports could not constitute red flags because (i) they were mere allegations of wrongdoing rather than evidence of securities fraud, and (ii) the complaint did not plead the defendants actually read the reports. *Id.* at 404–406. The court rejected these arguments, holding that scienter was adequately pled because the defendants had access to the reports and the authority to raise questions and voice

39

doubts about the financial statements, and the reports "constituted red flags suggesting the possibility" that the financial statements were materially misleading. *Id.* at 406. Similarly, as CFOs and Board members, Claiborne and Crossley had access to reports raising significant questions about the Company's financial statements, had the authority to question and doubt the financial statements, but instead recklessly ignored the red flags and signed the materially false and misleading statements. *See In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006).

The magnitude of the fraud affecting the Company's core business—the Company's revenue was almost entirely derived from Suboxone—provide a further inference of scienter. *See, e.g., Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at \*13 (D.N.J. July 31, 2019) ("core operation of the Company" and "the magnitude of the alleged fraud" contribute to a strong inference of scienter).

**CONCLUSION**[7]

For all of the foregoing reasons, Plaintiff respectfully submits that Defendants' motion to dismiss should be denied in its entirety.[8]

---

[7] As Plaintiffs have alleged a primary violation of §10(b), Plaintiffs also state a claim under §20(a) claim. Plaintiffs have alleged control, as well as culpable participation, by alleging scienter. *See, e.g., P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 623 (D.N.J. 2001)

[8] Alternatively, if the Court is inclined to grant any part of the Motion, Plaintiffs request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178 (1962).

Dated: January 28, 2020          **THE ROSEN LAW FIRM P.A.**


By: /s/ Laurence Rosen
Laurence Rosen
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**

Daniel Tyre-Karp (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: dtyrekarp@rosenlegal.com


*Lead Counsel for Plaintiffs*

41