**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MICHAEL VAN DORP, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>    Plaintiff,<br><br>    v.<br><br>INDIVIOR PLC, SHAUN THAXTER, MARK CROSSLEY, AND CARY J. CLAIBORNE,<br><br>    Defendants. | Case No. 2:19-cv-10792-ES-ESK<br><br><u>CLASS ACTION</u> |

**DECLARATION OF LAURENCE ROSEN IN SUPPORT OF (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND <u>REIMBURSEMENT OF LITIGATION EXPENSES</u>**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................1

II.  PROSECUTION OF THE ACTION ....................................................5

     A.   The Alleged Fraud .....................................................................5

     B.   The Initiation of the Action, Opposition to Defendants' Motion
          to Transfer, Appointment of Lead Plaintiff and Lead Counsel,
          and Preparation and Filing of the FAC ...................................7

     C.   The Parties Agree to the Settlement ........................................9

III. RISKS OF CONTINUED LITIGATION ...........................................10

     A.   Risks of Proving Liability.......................................................11

     B.   Risks of Proving Damages.......................................................11

     C.   Additional Significant Risks...................................................12

     D.   The Settlement Is Reasonable in Light of the Size of the
          Potential Recovery in the Action...........................................13

IV.  LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S
     PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE
     OF NOTICE ........................................................................................14

V.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ...............18

VI.  THE FEE AND LITIGATION EXPENSE APPLICATION .......................20

     A.   The Fee Application.................................................................20

          1.   The Work and Experience of Counsel....................................21

          2.   Standing and Caliber of Defendants' Counsel ........................23

          3.   The Risks of Litigation and the Need to Ensure the
               Availability of Competent Counsel in High-Risk
               Contingent Securities Cases ...................................................24

4.    The Reaction of the Class to the Fee Application .....................26

B.    The Litigation Expense Application ...................................................27

VII.    CONCLUSION ..................................................................................29

**TABLE OF EXHIBITS**

Exhibit 1:   Laarni T. Bulan and Laura E. Simmons, "Securities Class Action Settlements: 2020 Review and Analysis," (Mar. 2021)

Exhibit 2:   Declaration of Margery Craig Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests For Exclusion and Objections

Exhibit 3:   Declaration of Lead Plaintiff Michael Van Dorp

Exhibit 4:   Declaration of Laurence Rosen in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of The Rosen Law Firm, P.A.

Exhibit 5:   Peer Firm Billing Rates

I, LAURENCE M. ROSEN, declare as follows:

## I.        INTRODUCTION

1.        I am the Managing Attorney of The Rosen Law Firm, P.A. ("RLF"). RLF is the Court-appointed Lead Counsel[1] for Lead Plaintiff Michael Van Dorp ("Lead Plaintiff") and the Settlement Class in the Action. I have personal knowledge of the contents of this Declaration based on my active supervision of and participation in the prosecution and settlement of the claims asserted in the Action.

2.        I respectfully submit this Declaration, together with exhibits, in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently-filed memorandum in support thereof (the "Final Approval Memorandum"). As set forth in the Final Approval Memorandum, Lead Plaintiff seek final approval of the $2,000,000 Settlement for the benefit of the Class that the Court preliminarily approved by its Order dated September 16, 2021 (the "Preliminary Approval Order," ECF No. 48), for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation"); and certification of the Class for settlement purposes and appointing Plaintiff as the Class Representative.

---

[1] Unless otherwise defined in this Declaration, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated February 8, 2021 (the "Stipulation," ECF No. 42-1).

3.    I also respectfully submit this Declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and Award to Lead Plaintiff and the concurrently-filed memorandum in support thereof (the "Fee and Expense Memorandum"). Lead Counsel seek an award of attorneys' fees in the amount of $33^{1/3}$% (one-third) of the Settlement Fund (including interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $23,878.02, which includes Lead Counsel's total expenses in the amount of $18,878.02 and $5,000 to Lead Plaintiff in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") for his costs and expenses incurred in connection with their representation of the Class.

4.    The proposed Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $2,000,000. As detailed below, Plaintiff and Lead Counsel respectfully submit that the Settlement represents a very favorable result for the Class in light of the maximum recoverable damages alleged and the significant risks remaining in the Action. The Class's estimated maximum recoverable damages at trial were approximately $6.5 million. Thus, the recovery of $2.0 million represents approximately 31% of the Class's maximum damages potentially recoverable in this Action. The Settlement Amount represents a recovery of more than 100% of the recognized losses for all claims filed by Class members to date, even after deduction of the requested fees

2

and expenses. As explained further below, the Settlement provides a considerable benefit to the Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk that the Class could recover nothing or substantially less than the Settlement Amount after years of additional litigation and delay.

5. The proposed Settlement, reached only after nearly two years of hard-fought litigation, is the result of extensive efforts by Lead Counsel, which included, among other things: (i) conducting a thorough investigation of Indivior and the allegedly fraudulent misrepresentations made during the period from March 10, 2015 through April 9, 2019, inclusive (the "Settlement Class Period" or "Class Period") concerning Indivior's Suboxone Film to treat opioid dependence; (ii) drafting the initial Class Action Complaint for Violations of the Federal Securities Laws, filed April 23, 2019 (ECF No. 1); (iii) drafting the 116-paragraph Amended Class Action Complaint for Violations of the Federal Securities Laws, filed on September 30, 2019 (the "Complaint," ECF No. 18); (iv) researching, drafting, and filing an opposition to Defendants' motion to dismiss the Complaint, filed with the Court on January 28, 2020 (ECF No. 24); (v) researching, drafting, and filing the Request for Judicial Notice on September 15, 2020 (ECF No. 28) and the reply in further support of the Request on October 19, 2020 (ECF No. 31); (vi) negotiating

3

with Defendants on an arm's-length basis to resolve the Action; and (vii) preparing the Stipulation and obtaining preliminary approval of the Settlement.

6.    Lead Plaintiff and Lead Counsel believe that the Settlement is in the best interests of the Class. Due to their efforts described in the foregoing paragraph, Lead Plaintiff and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action prior to negotiating the Settlement, and they believe that the Settlement represents a very favorable outcome for the Class.

7.    As discussed in further detail below, the Plan of Allocation was developed with the assistance of Lead Plaintiff's damages expert and provides for the distribution of the Net Settlement Fund to Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on their losses attributable to the alleged fraud.

8.    As discussed in the Fee and Expense Memorandum, the requested fee of 33 ⅓% of the Settlement Fund for Lead Counsel is well within the range of percentage awards granted by courts in this Circuit and across the country in securities class actions. Additionally, the requested fee results in a multiplier of 1.83 on Lead Counsel's lodestar, which is in the lower end of the range of multipliers routinely awarded by courts in this Circuit and across the country.

9.    For all of the reasons discussed in this Declaration and in the accompanying memoranda, including the quality of the result obtained and the

numerous significant litigation risks discussed fully below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate and should be approved. In addition, Lead Counsel respectfully submit that its request for attorneys' fees and reimbursement of Litigation Expenses is also fair and reasonable and should be approved.

## II.   PROSECUTION OF THE ACTION

### A.   The Alleged Fraud

10.   This case involves alleged misrepresentations concerning Indivior's Suboxone Tablets and Suboxone Film, drugs that Indivior developed to treat opioid addiction.

11.   As alleged in Complaint, Indivior operated as a wholly owned subsidiary of Reckitt Benckiser Group PLC until being spun off into a separate company in 2014. In October 2002, the FDA approved Reckitt's application for the first buprenorphine-containing drugs for the treatment of opioid dependence: Suboxone Tablets and Subutex Tablets. Indivior had the exclusive right to market and distribute these drugs in the United States for seven years before any competitors would be allowed on the market.

12.   As alleged in the Complaint, by 2007, Indivior was generating over $260 million per year in revenue from Suboxone Tablets. Fearing that it would lose most of this revenue once competitors were allowed on the market, Defendants

hatched a scheme to switch patients to a new film version of Suboxone that would enjoy a new exclusivity period free from competition.

13.   As alleged in the Complaint, even before the FDA approved Suboxone Film in August 2010, Defendants repeatedly told health care providers and health care benefit program—in direct presentations and marketing materials—that Suboxone Film was safer for children, less divertible, and less abusable than other opioid-addiction treatment drugs. But Internal Indivior documents collected by investigators exposed that Defendants knew that Suboxone Film was—in many ways—more dangerous for children and more susceptible to diversion.

14.   As alleged in the Complaint, Indivior sought to boost profits even further by using its "Here to Help" program to connect opioid-addicted patients to doctors who were willing to prescribe Suboxone Film. The Company also revamped its incentive system for its salespeople to reward film sales instead of tablet sales. But the Company's Here to Help program was sending opioid-addicted patients to doctors it knew were prescribing Suboxone and other opioids to more patients than allowed by federal law, at high doses, and in a careless and clinically unwarranted manner.

15.   As alleged in the Complaint, Indivior withdrew Suboxone Tablets from the market due to "increasing concerns regarding pediatric exposure." This discontinuance forced the FDA to delay approval of generic tablets while safety tests

6

were conducted. But Defendants' discontinuance of Suboxone Tablets—announced in 2012 and completed in 2013—was not based on any real concern for child exposure. Rather, the Company used the discontinuance as a way to delay generic versions of the tablets from entering the market.

16.    On April 9, 2019, the Department of Justice filed a federal grand jury indictment charging Indivior with conspiracy to commit wire fraud, mail fraud, and health care fraud; one count of health care fraud; four counts of mail fraud; and twenty-two counts of wire fraud. The indictment stated that Indivior would be required to forfeit at least $3 billion, several business units, and several patents upon conviction. On this news, Indivior ADRs fell $4.48, or more than 66%, to close at $2.30 per ADR on April 10, 2019.

### B.    The Initiation of the Action, Opposition to Defendants' Motion to Transfer, Appointment of Lead Plaintiff and Lead Counsel, and Preparation and Filing of the FAC

17.    This litigation was commenced by Lead Plaintiff on April 23, 2019, with the filing of a putative securities class action complaint ("Initial Complaint") in this Court. ECF No. 1.

18.    On June 24, 2019, Van Dorp filed the sole motion for appointment of lead plaintiff and approval of lead counsel. (ECF No. 5).

19.    On July 30, 2019, the Court appointed Van Dorp as Lead Plaintiff and The Rosen Law Firm, P.A. as Lead Counsel. (ECF No. 12).

7

20.   In preparation for filing the Complaint, Lead Counsel conducted an extensive factual and legal investigation that included, among other things, review and analysis of: (i) documents filed publicly by Indivior with the Securities and Exchange Commission ("SEC"); (ii) Indivior press releases and other public statements; (iii) transcripts of Indivior investor conference calls; (iv) research reports concerning Indivior by financial analysts; and (v) the DOJ's indictment of Indivior. Lead Counsel also conducted an exhaustive analysis of applicable Third Circuit case law and consulted with loss causation and damages experts.

21.   Pursuant to the Parties' so-ordered stipulation (ECF No. 11), on September 20, 2019, Lead Plaintiff, on behalf of himself and a putative class, filed the operative Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") asserting claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (ECF No. 18).

22.   On November 29, 2019, Defendants moved to dismiss the Amended Complaint. (ECF No. 20). Lead Plaintiff filed an opposition to the motion to dismiss on January 28, 2020 (ECF No. 24), and Defendants filed their reply in further support of the motion to dismiss on February 27, 2020 (ECF No. 25).

23.   On September 15, 2020, Lead Plaintiff filed a Request for Judicial Notice. (ECF No. 28). Defendants filed their Opposition to the Request for Judicial Notice on September 24, 2020 (ECF No. 29), and Lead Plaintiff filed his Reply in

Further Support of his Request for Judicial Notice on October 19, 2020 (ECF No. 30).

### C. The Parties Agree to the Settlement

24. With the motion to dismiss pending, the Parties began settlement negotiations in April 2020. After a series of telephonic and email communications and negotiations, the Parties on December 3, 2020 reached an agreement on the key terms of a settlement, subject to the negotiation of a mutually acceptable long form Stipulation and approval of the Court. The key terms included the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for a cash payment by or on behalf of Defendants of $2.0 million for the benefit of the Class, subject to certain terms and conditions and the execution of a customary stipulation and agreement of settlement and related papers.

25. On December 4, 2020, Defendants notified the Court that the Parties were in settlement discussions and requested, with Lead Plaintiff's consent, that the Court hold its decision on the motion to dismiss in abeyance for 45 days to permit the Parties to negotiate a stipulation of settlement. (ECF No. 32).

26. Over the next months, the Parties negotiated the Stipulation and Agreement of Settlement, which included the notices to be disseminated to the Class.

27. On December 7, 2020, the Court entered a Text Order granting the request to hold a decision on the motion to dismiss in abeyance and directed the

Parties to update the Court on the status of the settlement discussion by January 21, 2021. (ECF No. 34). At the request of the Parties, the Court extended its abeyance on January 22, 2021 (ECF No. 38) and on February 5, 2012 (ECF Nos. 40-41).

28.     On February 9, 2021, Lead Plaintiff submitted the Stipulation to the Court and requested preliminary approval of the Settlement so that notice could be disseminated. ECF Nos. 42-43.

29.     On September 16, 2021, the Court entered the Preliminary Approval Order, which, among other things, (i) preliminarily approved the Settlement, (ii) directed that notice of the pendency of the Action and the proposed Settlement be provided to the Class, and (iii) set the Settlement Fairness Hearing for January 6, 2022. ECF No. 48.

## III.    RISKS OF CONTINUED LITIGATION

30.     The Settlement provides an immediate and certain benefit to the Class in the form of a $2.0 million cash payment and represents (if approved) a significant portion of the recoverable damages in the Action, as determined by Lead Plaintiff's damages expert, particularly after considering arguments that could be made by Defendants concerning loss causation and damages. As explained below, Defendants had substantial defenses with respect to liability, loss causation, and damages in this case. These arguments created a significant risk that, after years of

10

protracted litigation, Lead Plaintiff and the Class could achieve no recovery at all, or a lesser recovery than the Settlement Amount.

### A. Risks of Proving Liability

31. In addition to the hurdles of proceeding past the pleading stage and obtaining class action status (discussed below), Lead Plaintiff and Lead Counsel faced numerous additional risks at summary judgment and trial, including establishing Defendants' liability. Defendants forcefully argued in their motion to dismiss—and undoubtedly would have continued to argue at summary judgment and/or trial—that Plaintiffs could not establish the elements of their Securities Exchange Act claims.

32. For example, Defendants would argue that Defendants had no duty to disclose the alleged fraudulent scheme, that certain of the alleged misstatements were made before the Class Period, and that the Complaint fails to plead scienter with particularity.

### B. Risks of Proving Damages

33. Even assuming that Lead Plaintiff overcame each of the above risks and successfully established liability, he would have confronted considerable challenges in establishing class-wide damages. Lead Plaintiff and Defendants almost certainly would have presented their own damages expert(s), who would have no doubt presented conflicting conclusions and theories for the true damages. This "battle of

11

the experts" creates an additional litigation risk because the reaction of a trier of fact to such expert testimony is highly unpredictable, creating uncertainty regarding how much weight a judge or jury will accord the analysis of Defendants' competing experts.

### C.    Additional Significant Risks

34.    Lead Plaintiff would have to prevail at several stages of litigation, each of which would have presented significant risks in complex class actions such as this one. Lead Counsel knows from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.

35.    Additionally, a recent ruling by the United States Supreme Court has made obtaining class certification for Plaintiffs more difficult and could potentially provide additional challenges should the litigation against Defendants proceed. In *Goldman Sachs Grp. v. AR Teacher Ret.*, 141 S.Ct. 1951 (June 21, 2021), the Supreme Court held, in part, that when defendants are seeking to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may consider the generic nature of an alleged misrepresentation as evidence of lack of price impact. Accordingly, courts are now permitted to assess materiality of an alleged misstatement and consider "all evidence relevant to price impact" at the class certification stage.

36.    Even if Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants almost certainly would have appealed. An appeal not only would have renewed all the risks faced by Lead Plaintiff—as Defendants would have reasserted all their arguments summarized above—but also would have resulted in significant additional delay. Given these significant litigation risks, Lead Plaintiff and Lead Counsel believe that the Settlement represents an excellent result for the Settlement Class

### D.    The Settlement Is Reasonable in Light of the Size of the Potential Recovery in the Action

37.    As discussed above, Lead Plaintiff's financial expert estimated that the maximum recoverable damages that could be established in the Action, assuming that Lead Plaintiff successfully established the elements of falsity and scienter, would be approximately $6.5 million. This is based on financial model prepared by the expert that estimates trading Class members during the Class Period and then estimates the potential damages from the trading model.

38.    Proving the maximum recoverable damages reflected in these estimates assumes that Lead Plaintiff would have prevailed on all of its merits arguments about falsity, scienter, loss causation and that all or most aspects of the case would be proven at trial. The Settlement's recovery of 30.8% of the Class's maximum estimated damages is significantly higher than the median recoveries reported by Cornerstone Research. Specifically, according to the latest analysis by Cornerstone

13

Research, the median recovery in securities class actions in 2020 with estimated damages of less than $25 million was 19.7%.[2]

39.     The Claims Administrator reports that Class members have actually filed potentially valid claims with recognized losses of approximately $773,406. The deadline to file claims was December 7, 2021. This means that if the Court were to grant Lead Plaintiff's request for legal fees and expenses in full, Class members would recover at least 100% of their compensable losses after payment of legal fees and expenses.

40.     For all these reasons, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and that it is in the best interests of the Class to accept the immediate and substantial benefit conferred by the Settlement, instead of incurring the significant risk that the Class might recover a lesser amount, or nothing at all, after protracted and costly litigation.

## IV.     LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

41.     The Court's Preliminary Approval Order directed that the Notice and Claim Form (together, the "Notice Packet") be disseminated to the Class. The Preliminary Approval Order also set a December 16, 2021 deadline for Class

---

[2] Laarni T. Bulan and Laura E. Simmons, "Securities Class Action Settlements: 2020 Review and Analysis," (Mar. 2021), at p. 6, Fig. 5 (attached hereto as Exhibit 1).

14

Members to submit objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Class, and set a final fairness hearing date of January 6, 2022.

42.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed Strategic Claims Services ("SCS"), the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and to publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed SCS to post downloadable copies of the Long Notice and Claim Form at the case-specific website dedicated to this Settlement, www.strategicclaims.net/indivior/ (the "Settlement Website").

43.    Upon request, SCS mailed copies of the Notice and/or Claim Form to potential Class Members and will continue to do so until the deadline to submit a Claim Form has passed. The Notice contains, among other things, a description of the Action; the definition of the Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or exclude themselves from the Class. The Notice also informs Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33 ⅓% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $35,000. To

15

disseminate the Postcard Notices, SCS obtained from Indivior's transfer agent the names and addresses of Indivior record holders of Indivior ADRs that are potential Class Members. *See* Declaration of Margery Craig Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests For Exclusions and Objections ("Craig Declaration"), attached hereto as Exhibit 2, ¶ 4.

44.     In addition, SCS maintains a proprietary database with the names and addresses of 2,236 of the most common mutual funds, banks and brokerage firms, nominees, and known third party filers. *See id.* at ¶ 3.

45.     To date, SCS has mailed a total of 8,853 Postcard Notices to potential Class Members, brokers and nominee holders. *Id.* at ¶ 5. Additionally, SCS was notified by one of the nominees that they emailed 1,558 of their customers to notify them of this settlement and provide direct link to the Long Notice and Claim Form on the settlement website. *Id.* at ¶ 6. In total 10,411 potential Settlement Class Members were notified either by mailed Postcard Notice or emailed a direct link to the Long Notice and Claim Form. ¶ 7.

46.     On October 11, 2021, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *Globe Newswire*. *See id.* at ¶ 10.

16

47.     Lead Counsel also caused SCS to establish a dedicated settlement website, www.strategicclaims.net/indivior/, to provide potential Class Members with information concerning the Settlement, download copies of the full Notice and Claim Form, as well as copies of the Stipulation and Preliminary Approval Order. *Id.* at ¶ 12. The website also allows claimants to submit their Claim online instead of sending one in via U.S. Mail. *Id.* Moreover, SCS established a toll-free telephone number for Class Members. *Id.* at ¶ 11.

48.     The deadline for Class Members to file objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is December 16, 2021. To date, no requests for exclusion have been received. *Id.* at ¶ 13. SCS will submit a supplemental affidavit after the deadline addressing any requests for exclusion received. To date, no objections to the Settlement, the Plan of Allocation or the maximum amounts listed in the Notice that Lead Counsel would seek for an award for attorneys' fee and reimbursement of Litigation Expenses have been entered on this Court's docket, or have otherwise been received by Lead Counsel or SCS. *See Id.* at ¶ 14. Lead Counsel will file reply papers on December 30, 2021 that will address any requests for exclusion and any objections that may be received.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

49.    In accordance with the Preliminary Approval Order, and as described in the Notice, all Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (i) any Taxes, (ii) any Notice and Administration Costs, (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Plaintiffs for their costs and expenses incurred in representing the Settlement Class), and (iv) any attorneys' fees awarded by the Court) must submit valid Claim Forms with all required information postmarked no later than December 7, 2021. As described in the Notice, the Net Settlement Fund will be distributed among Class Members according to the plan of allocation approved by the Court.

50.    To date, SCS has received 1,767 timely claim forms. *Id.* at ¶ 15. The preliminary count—which does not include any adjustments as a result of SCS's quality assurance process, which includes the results of the cure/rejection process of valid claims—includes 108 valid claims for $235,132 of recognized losses, 17 deficient claims for $528,274 of recognized losses that may become valid claims if the Class members submit sufficient additional documentation, and 1,642 invalid claims. *Id.* at ¶ 16.

51.    Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class

18

Members who suffered losses as result of the conduct alleged in the Complaint. The proposed Plan of Allocation reflects an assessment of the damages that Lead Plaintiff contend could have been recovered under the theories of liability asserted in the Action. The proposed Plan of Allocation reflects Lead Plaintiff's contention that because of the alleged misrepresentations made by Defendants, the price of Indivior securities was artificially inflated during the Settlement Class Period and that certain subsequent disclosures caused changes in the inflated price of Indivior securities. Indivior ADRs purchased or otherwise acquired and sold during the Settlement Class Period must have been sold at a loss and after an alleged corrective disclosure to qualify as a Recognized Loss. Trading gains, if any, will have a Recognized Loss of $0.

52.     The Plan of Allocation is set forth at pages 5-8 of the Notice. *See* Ex. 2-C (Notice) at 5-8. The Plan of Allocation distributes a pro-rata portion of the Net Settlement Fund to each Class member based on each Class members' recognized loss as a percentage of the total recognized losses of all Class members that have submitted valid claims.

53.     Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court. To date, no objection to the proposed Plan of Allocation has been received. *Id.* at ¶ 14.

19

## VI.   THE FEE AND LITIGATION EXPENSE APPLICATION

54.   In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees of 33 1/3% of the Settlement Fund, or $666,666.67, plus interest earned at the same rate as the Settlement Fund. Lead Counsel also request reimbursement of expenses incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $18,878.02. Lead Counsel further request reimbursement to Lead Plaintiff of $5,000 in costs and expenses he incurred directly related to his representation of the Class in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4). The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee and Expense Memorandum. The primary factual bases for the requested fee and expenses are summarized below.

### A.   The Fee Application

55.   For their efforts on behalf of the Class, Lead Counsel are applying for a fee award to be paid from the Settlement Fund on a percentage basis. As discussed in the accompanying Fee and Expense Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the Class's interest in achieving the maximum recovery in the shortest amount of time required under the circumstances and has been recognized as appropriate by the Supreme Court and Third Circuit for cases of this nature.

20

56.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved. As discussed in the Fee and Expense Memorandum, a 33 ⅓% fee award is fair and reasonable for attorneys' fees in common-fund cases like this and is well within the range of percentages awarded in securities class actions in this Circuit and elsewhere for comparable settlements.

### 1.     The Work and Experience of Counsel

57.     As set forth below, Lead Counsel dedicated a total of 474.7 hours to the investigation, prosecution, and resolution of the action, with a resulting total lodestar of $363,442.50. The requested 33 ⅓% fee (or $666,666.67, plus interest accrued thereon) thus equates to a lodestar multiplier of 1.83.

58.     Set forth below is a chart that summarizes lodestar information, listing the total reported hours expended, corresponding lodestar amounts, and litigation expenses for Lead Counsel.[3]

| Firm | Total Hours | Total Lodestar |
|------|-------------|----------------|
| The Rosen Law Firm | 474.7 | $363,442.50 |

[3] Attached hereto as Exhibit 4 is a declaration from Lead Counsel in support of the request for an award of attorneys' fees and reimbursement of litigation expenses. The declaration reports the amount of time spent on this case by each attorney and professional support staff employed by Lead Counsel, and the lodestar calculations are based on their current billing rates. For attorneys or professional support staff who are no longer employed by Lead Counsel, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment. No time expended in preparing the application for fees and reimbursement of expenses has been included.

59.     The hourly rates for the attorneys and professional support staff in my firm are similar to the rates that have been accepted in other securities or shareholder litigation. Additionally, when determining the market rate by looking at fees awarded in similar cases, the rates billed by Lead Counsel (ranging from $675-$750 per hour for non-partners and $975-$1,100 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Ex. 5 attached hereto (table of peer firm billing rates).

60.     The above lodestar chart was prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel. Time expended on Lead Counsel's application for fees and reimbursement of expenses has not been included in this request.

61.     Lead Counsel believe that the requested fee award is fair and reasonable based on the work performed, *the fact that the case was taken on a purely contingent basis*, the risks of the litigation, the quality of the representation, and the result obtained.

62.     Throughout this litigation, Lead Counsel took extreme care to ensure that staffing was as lean as possible to litigate effectively and efficiently without negatively impacting the prosecution of the Action. At all times, I maintained strict control of and monitored the work performed by all lawyers and other personnel on

22

this case. While I personally devoted substantial time to this case, and personally reviewed and edited all pleadings, briefs, court filings, and other correspondence prepared on behalf of Lead Plaintiff, other experienced attorneys at Lead Counsel were involved in the litigation of the action, the Settlement negotiations, and other matters. More junior attorneys worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel took care to maintain an appropriate level of staffing and assigned work to those attorneys best suited for the task based on their level of experience and skill. This avoided unnecessary duplication of effort and ensured the efficient prosecution of this action.

63.     As demonstrated by the firm resume included as Exhibit 4-A hereto, Lead Counsel is an experienced and skilled law firm in the securities litigation field, with a long and successful track record representing investors in such cases. I believe that Lead Counsel's experience and track record added valuable leverage in the settlement negotiations.

### 2.     Standing and Caliber of Defendants' Counsel

64.     The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Covington & Burling LLP, one of the country's most prestigious and experienced defense firms, which vigorously represented its clients. In the face of this experienced, formidable, and well-financed opposition,

23

Lead Counsel were nonetheless able to persuade Defendants to settle the case on terms favorable to the Class.

### 3. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

65. This prosecution was undertaken by Lead Counsel entirely on a contingent-fee basis. The risks assumed by Lead Counsel in bringing these claims to a successful conclusion are described above. Those risks are also relevant to an award of attorneys' fees.

66. From the outset, Lead Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel ensured that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the nearly two years the Action has been pending and have incurred $18,878.02 in litigation expenses in prosecuting the Action for the benefit of the Class.

24

67.    Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this Action is never assured.

68.    Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

69.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

70.    Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class. In these circumstances, and in consideration of the hard work and the excellent result achieved, I believe the requested fee is reasonable and should be approved.

### 4.    The Reaction of the Class to the Fee Application

71.    As noted above, to date a total of 10,411 potential Settlement Class Members and their nominees were sent notice that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33 1/3% of the Settlement Fund. *See* Craig Decl., at ¶ 7 & Ex. A. In addition, the Court-approved Summary Notice has been published in the *Investors' Business Daily* and transmitted over the *Globe Newswire*. *Id.* at ¶ 10. To date, no objection to the attorneys' fees set forth in the Notice has been received. Should any objections be received, they will be addressed in Lead Counsel's reply papers to be filed on or before December 30, 2021, after the deadline for submitting objections has passed.

72.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 33 1/3%,

26

resulting in a lodestar multiplier of 1.83, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### B.   The Litigation Expense Application

73.   Lead Counsel also seek reimbursement from the Settlement Fund of $18,878.02 in litigation expenses that were reasonably incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.

74.   From the beginning of the case, Lead Counsel were aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until the Action might be successfully resolved. Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced to prosecute the Action. Accordingly, Lead Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

75.   As set forth in Exhibit 4 hereto, Lead Counsel have incurred a total of $18,878.02 in unreimbursed litigation expenses in connection with the prosecution of the Action. The expenses are summarized in Exhibit 4 by category of expense,

*e.g.*, expert fees, on-line research, photocopying, and postage expenses, and the amount incurred for each category.

76.    Of the total amount of expenses, $9,612, or approximately 50%, was expended for the retention of experts in the fields of financial analysis and damages. During the settlement process, these experts prepared various damages estimates under different scenarios.

77.    Another large component of expenses, $5,630, was expended on the retention of a private investigation firm to assist Lead Counsel in its factual investigation into Lead Plaintiff's claims.

78.    The other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, copying costs, translation costs, postage and delivery expenses, and online research.

79.    All of the litigation expenses incurred by Lead Counsel were reasonable and necessary to the successful litigation of the Action.

80.    Additionally, Lead Plaintiff seeks reimbursement of his reasonable costs and expenses incurred directly in connection with its representation of the Class over the course of this litigation, in the amount of $5,000. *See* Van Dorp Decl., ¶ 3. Here, Lead Plaintiff, Mr. Van Dorp, devoted significant amounts of his time to the litigation. Among many other things, Lead Plaintiff: (i) regularly communicated

with Lead Counsel by regarding the posture and progress of the case; (ii) reviewed all significant pleadings filed in this action; (iii) reviewed Court orders and discussed them with Lead Counsel; (iv) consulted with Lead Counsel regarding settlement negotiations; and (v) evaluated and approved the proposed Settlement. *See id*., ¶ 7.

81.    The Notice informed potential Class Members that Lead Counsel would be seeking reimbursement of expenses, including reimbursement for the Lead Plaintiff, in an amount not to exceed $35,000. The total amount requested, $23,878.02, which includes $18,878.02 in reimbursement of litigation expenses incurred by Lead Counsel and $5,000 in reimbursement of costs and expenses incurred by Lead Plaintiff, is well below the $35,000 that Class Members were advised could be sought. To date, no objection has been raised as to the maximum amount of expenses disclosed in the Notice. Lead Counsel will address any objections in its reply papers.

82.    The expenses incurred by Lead Plaintiff were reasonable and necessary to represent the Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.  CONCLUSION

83.    For all the reasons discussed above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be

approved as fair, reasonable, and adequate. Lead Counsel further submits that the requested fee in the amount of 33 1/3% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total Litigation Expenses in the amount of $23,878.02 which includes Lead Plaintiff's costs and expenses, should also be approved.

I declare, under penalty of perjury under the laws of the United States, that the foregoing facts are true and correct. Executed this 9[h] day of December 2021, at Newark, New Jersey.

/s/ *Laurence Rosen*
Laurence Rosen

30